## PETITE v. THE PEOPLE.

1. Where a prosecuting attorney mentioned the fact, in his argument, of the prisoner not availing himself of the benefit of the statute to testify in his own behalf, and was immediately checked, and the court instructed the jury not to consider the conduct of the prisoner in this behalf, *held,* that such conduct of the prosecutor was not fatal to the judgment.
2. Under the facts of this case, *held,* that the verdict and death sentence were unwarranted.

. *Error to District Court of Las Animas County.*

THE facts are stated in the opinion.

Messrs. JOHN and GUNTER, for plaintiff in error.

Attorney-General T. H. THOMAS, for defendants in error.

HELM, J.   Petite was tried and convicted of murder in the first degree.   His motions for a new trial and in arrest were denied.   Sentence of death being duly pronounced, the judgment and proceedings were brought to this court for review.

But two of the errors assigned are argued by counsel.

I. Plaintiff in error did not take the witness stand and testify in his own behalf.   During the progress of his remarks to the jury, the acting district attorney, referring to certain testimony offered by the prosecution, stated that no effort whatever had been made on the part of defendant to contradict or disprove the same.   That defendant, "who had been present in court, and heard the testimony, who knew its truth or falsity, and was a competent witness in his own behalf, had not gone upon the witness stand and denied it."   Whereupon counsel for the defense interposed an objection, which the court sustained, and the prosecuting attorney instantly desisted. The court also immediately instructed the jury " that the

failure of the defendant to testify in his own behalf could not be used to his prejudice, and should not be regarded by them." This alleged misconduct of the prosecuting attorney constitutes one of the errors discussed.

Section 704 of the General Statutes reads as follows: "Hereafter in all criminal cases tried in any criminal court of this state, the accused, if he so desires, shall be sworn as a witness in the case, and the jury shall give his testimony such weight as they think it deserves; but in no case shall the neglect or refusal of the accused to testify be taken or considered any evidence of his guilt or innocence."

The foregoing provision was doubtless adopted by the legislature for the purpose of aiding the accused in making his defense. Whether or not it has proven in practice really beneficial to him is a debatable question. Even, though court and counsel be silent upon the subject, some of the jurors are apt to be aware of the accused's statutory right to testify, and in making up their verdict, the fact that he has refrained from so doing is likely to have weight with them. On the other hand, should he elect to exercise the privilege, he is subject to the same evidential rules as are other witnesses, including those relating to cross-examination and impeachment; and he acts at a disadvantage on account of the peculiar distrust with which his testimony is regarded. But, on the whole, the statute may be salutary in its general operation, so far as the attainment of truth and the administration of justice are concerned. Too much care, however, cannot be exercised by courts in giving effect to the latter part of the provisions above quoted. Otherwise, as suggested by an eminent writer, "there will be a practical abrogation of the great constitutional and juridical principle that no man is to be compelled to criminate himself." For if silence is to be taken as evidence of guilt, defendant's option is of but little avail; he is practically forced to testify, and once upon the stand may

be required to give the very testimony upon which his conviction shall rest.

Counsel in the case at bar was doubtless guilty of misconduct. No allusion whatever should have been made by him to the fact that defendant was not sworn as a witness. But we are of opinion that the judgment should not be reversed on this ground. Counsel was at once stopped by the court, and an instruction was immediately given for the purpose of averting any prejudicial effect that might otherwise follow from the remark in question.

To the proposition advanced, that when the minds of the jury have been once directed to the fact, the injury is consummated, and cannot in any manner be counteracted, it may be answered: 1. As already suggested, that the jury, or some of them, are very apt to be aware of defendant's right to testify. 2. That if he declines to testify, an instruction of the court on the subject is generally given either upon its own motion or at defendant's request; the omission of such instruction would be dangerous, and its refusal, when asked, would constitute error. Thus, in either event, the failure to testify would be noticed by the jury; but no error could be predicated thereon. While such conduct of counsel as is here complained of is censurable, and justifies rebuke, perhaps punishment, we do not think that under the circumstances disclosed it could have prejudiced the rights of defendant. See Wharton's Crim. Ev. (8th ed.) 435, 435a, and cases cited.

Two cases are cited to show that the action of the court did not neutralize supposed pernicious consequences of the allusion by counsel, viz.: *Angelo v. People*, 96 Ill. 209; *Long v. State*, 56 Ind. 182. Upon examination, we find that the statutes of Illinois and Indiana, under which the decisions mentioned were rendered, are unlike ours. In each it is expressly declared that the neglect or refusal of the accused to testify *shall not be referred to or com-*

*mented upon;* and the decisions are based upon the fact that in those cases there was a palpable infringement of this particular part of the statute.

II. The remaining assignment of error argued by counsel is, we think, fatal to the judgment below. It challenges the sufficiency of the evidence to sustain the verdict and sentence.

Upon the following facts there is practically no conflict in the evidence, viz.: That the deceased and accused were both saloon-keepers in the town of Starkville, near Trinidad; that they were, at the time of the homicide, apparently on friendly terms; that just previous to the killing they had been going about the town drinking together; that deceased either struck or pushed an Italian, who was beside him at the bar in defendant's saloon, so as to cause a bottle of liquor which the Italian held to fall on the floor; that defendant quietly walked around the bar and picked up the bottle, remarking, as he did so, "Charlie, you have spilled my whisky;" that deceased answered that "he didn't care, he didn't propose to have his drinks mixed;" that defendant then walked behind the bar and deceased — some more words passing between them, which are not in evidence — drew off his coat and threw it upon the floor for the purpose of assaulting defendant.

At this juncture there is conflict in the testimony of the witnesses present as to what occurred. The only person sworn by the state who saw the transaction — Tanner, an American — declares that when deceased threw off his coat, defendant, with the bottle in his hand, was "reaching backward, making a motion," and that as the coat fell he pulled his pistol from his pocket and fired the fatal shot; deceased then being nearly opposite him, with the bar between, and about six feet distant. On the other hand, seven witnesses, Italians, swore that when the coat was thrown off deceased reached across the bar and struck defendant a blow in the face (one of them puts it

that he attempted to strike the blow); that deceased then moved quickly to the end of the bar, and was reaching with his left hand to grasp defendant's throat, his right hand being thrown behind him towards or upon his hip pocket as if to draw a weapon, when defendant picked up a pistol which was lying behind the bar and fired two shots in rapid succession, one of them producing death.

The statements of these witnesses for the defense ap-. pear to be corroborated, and that of Tanner contradicted, by a circumstance which is not disputed. The vest of deceased was powder-burned where the bullet passed through it. The physician for the state testifies that the muzzle of the revolver when fired could not have been over twelve or eighteen inches distant from the cloth to produce this effect. It is true, he said, the experiments upon which he relied were made in the open air, and that the size of the charge of powder would make a difference; but it is apparent that the parties could hardly have been six feet apart, with the bar — which we must suppose was of ordinary height — between them, as Tanner testifies.

Still another circumstance confirming the Italian witnesses, and not aiding Tanner's testimony, is the course which the ball pursued after entering the body; this course is much more in harmony with deceased's position at the instant, as described by the former, than his attitude as indicated by the latter. The *post-mortem* examination was very unsatisfactory; but from this and from the testimony of the embalmer and the physician attending before death, it is clearly shown that the ball entered near the heart, ranged downward so as to "implicate the stomach and urethra, bladder or kidneys, probably the bladder," and lodged on the opposite side against the hipbone. There was probably a deflection from a straight line; but according to Tanner's testimony the ball must have made almost a right angle after entering the body, while a much slighter change of course would be neces-

sary if deceased was in the attitude detailed by the other witnesses.

Again: there is the testimony of two witnesses (one of them being the presiding magistrate) tending to show that, at the preliminary examination, Tanner stated, under oath, that when the shot was fired deceased was facing accused and in a fighting attitude. Such statements, if then made by him, not only differed materially from those given at the trial, but were absolutely inconsistent with truth; for had deceased been facing accused, and in the position mentioned, it would have been utterly impossible for the ball to enter the back part of the chest, "a little below and behind" the heart, as it did.

The state offered some evidence for the purpose of showing premeditation. It appears therefrom that about eight days prior to the homicide accused entered a store in Trinidad and bought some cartridges for his revolver, saying they had broken in his door, and the next time they did it he proposed to kill them, or words to that effect. When asked whom he meant by "they," he declined giving names, but merely remarked: "I know who they are." It further appears that a few days prior to this conversation, deceased, between 12 and 1 o'clock at night, while upon a drunken spree, broke in the door of defendant's saloon, aroused the latter, and demanded a drink of liquor, holding in his hand all the time a revolver. A woman, testifying on behalf of the state, said that, about a week prior to the killing, she, in company with deceased, met accused on the platform of the railroad depot at Trinidad, when the latter, with his right hand in his pocket, "called on his God, and said if he didn't get him that day he would again;" whereupon deceased proposed to make him take it back, but was persuaded by witness not to do so. This witness further states that, on the day of the occurrence just narrated, deceased was twice invited by accused to take dinner with

him, the second invitation being accepted; also, that accused and deceased "seemed very friendly."

The foregoing evidence of threats, indefinite and unsatisfactory as it is, might perhaps have cast light upon the homicide had different circumstances immediately attended and surrounded the same. But in these circumstances, as disclosed, it does not appear that defendant invited the affray or took advantage of the disturbance in his saloon to carry out a preconceived murderous purpose. On the other hand, it is clear that deceased was the aggressor. He pushed or struck the Italian (six of the witnesses say he knocked him down), and caused the bottle of liquor to fall upon the floor. When quietly remonstrated with by defendant, he answered in a cross and surly manner. The evidence indicates that, while defendant was doing nothing, deceased pulled off his coat and prepared to assault him. According to the testimony of seven witnesses against one, which testimony is corroborated by material and pertinent circumstances, it is shown that he then advanced and struck the defendant, or attempted to strike him, in the face; that, still endeavoring to carry out his unlawful design, he passed to the end of the bar, where he could more readily reach defendant's person, and was attempting to grasp the latter's throat, with his right hand behind him, when the fatal shot was fired. Deceased was unquestionably a powerful man. One end of the bar was against the wall, and if he was at the open end, defendant could escape only by leaping over the same with extreme difficulty and danger.

This court, in common with other courts of last resort, hesitates to assume the responsibility of nullifying the verdicts of juries on account of insufficient evidence to authorize the same. Such verdicts, as a rule, will not be molested unless there is reason to believe either that the jury must have been influenced by passion or prejudice,

or that they misconceived the scope and effect of the evidence.

But, under all the circumstances disclosed in the case at bar, we feel constrained to say that our duty commands us to interfere. No part of the charge is contained in the record, save the instruction mentioned, and we must assume, therefore, that the law was correctly stated. But we cannot reasonably find, from the proofs in this record, sufficient warrant for the penalty of death; the jury must have misunderstood the evidence or misconceived its scope and effect.

If the accused, without premeditation or deliberation, voluntarily took the life of deceased when it was not absolutely necessary in order to protect his own life, or to prevent great bodily harm, or when it would not have so appeared to a reasonable and prudent man, he undoubtedly deserves to be punished. The penalty, however, prescribed by law for such an offense, whether it be murder in the second degree or manslaughter, is not the one here pronounced.

Evidence may, of course, be offered at another trial which will sustain the verdict and judgment now before us. Upon this record, however, the judgment must be reversed, and the cause remanded for further proceedings.

*Reversed.*