# SUPREME COURT

OF THE

## STATE OF COLORADO.

### SEPTEMBER. TERM, 1911.

[No. 7128.]

### PIEL v. THE PEOPLE.

1. CRIMINAL LAW—*New Trial—Duty of Trial Court—* Where, upon motion for a new trial the sufficiency of the evidence is challenged, it is the duty of the trial court to consider all the evidence, and the facts and circumstances thereby presented, and unless reason and judgment approve the verdict, to grant a new trial—(6-8).

The evidence examined and held insufficient to sustain a conviction for premeditated murder—(10).

2. PRACTICE IN SUPREME COURT—*Revisory Authority of the Court*—The court has no power to decided matters not submitted to it according to the forms of the law—(5).

3. ——*Harmless Error*—The denial of a motion to arrest judgment upon a criminal information is harmless. Every proposition which might have been urged in its support may still be presented—(5).

[1]

*Error to Weld District Court.*—HON. JAMES E. GARRIGUES, Judge.

Mr. F. W. SANBORN and Mr. G. Q. RICHMOND for plaintiff in error.

Hon. JOHN T. BARNETT, attorney general, Mr. JAMES M. BRINSON, deputy attorney general, Hon. BENJAMIN GRIFFITH, attorney general, and Mr. THEO. M. STUART, assistant attorney general for the people.

Mr. JUSTICE WHITE delivered the opinion of the court:

Fred Piel, a native of Russia, unable to speak or understand the English language, was tried for, and convicted of the murder of George Kerber, and upon the verdict of the jury, sentenced to death. He brings the case here for review.

The difficulty, resulting in the death, occurred at the home of Henry Frank, the father-in-law of the defendant, about dusk of the evening of October 24, 1909. Mr. Frank, who is also a Russian, had invited the members of his family, and a few friends, to celebrate the Sunday in a way common among the Russians in that section. He provided for the occasion, a keg of beer, and a bottle of whiskey. In the forenoon of the day, defendant at his own home drank several glasses of whiskey, becoming somewhat intoxicated, and in the afternoon, still under the influence of the liquor, he, as an invited guest, went to Henry Frank's house, taking with him a quart bottle of whiskey. Thereafter, the defendant, with other members of the Frank family, and three or four neighbors, drank the greater portion of the keg of beer, the defendant imbibing from fifteen to twenty glasses. About 4 o'clock the deceased, with two

friends, none of whom had been invited, but all appeared
to be welcome, stopped at the Frank house, and partici-
pated in the festivities.   They, in company with the de-
fendant and others, drank a few glasses of whiskey, and,
in an apparently friendly manner, remained in the house
about half an hour talking.   Defendant and deceased
thereupon became involved in a quarrel over the owner-
ship or value of a beer keg, which had been used at some
previous like party or picnic.   Thereupon, Lizzie Frank,
the defendant's sister-in-law, requested them to be quiet,
and to leave the house.   The parties, except defendant
and the Frank family, presently retired to the yard con-
gregating at, or near, the southwest corner of a house
belonging to one Weigant, a neighbor residing about
one hundred feet south of the Frank house.   There they
engaged in general conversation relative to their crops
and the harvesting thereof.   About fifteen minutes there-
after, defendant came out of his father-in-law's house
and went to the barn to answer a call of nature.   Emerg-
ing from the barn he saw the group at the corner of the
Weigant house and joined them.   Upon approaching and
seeing the deceased, defendant asked him why he had
struck him in the house, to which deceased replied:
"Stand back, I don't want to talk to you."   Thereupon,
the defendant and deceased almost simultaneously began
fighting, striking each other with their fists, across or
over the shoulders of one Wray, the latter placing his
hands on each of the combatants and endeavoring to
keep them apart.   They pushed Wray aside, and the
deceased stepped back a few feet and picked up a board,
an inch or so thick, three or four inches wide and three
or four feet long.   As the deceased was raising up to
strike defendant with the board, or simultaneously with
the stroke therefrom, the defendant drew from his pocket

an ordinary pocket knife, having a blade about two inches long, and in a dazed condition stabbed the deceased with the knife, penetrating the abdominal wall, inflicting the wound from which the deceased died. When the board struck or fell upon the head of defendant, the latter stumbled to the ground, while the deceased turned, walked to the barn and presently returned exhibiting the wound, and announcing his belief that he would die therefrom. The defendant, without comment or giving utterance to any words, made his way into his father-in-law's house, wiped the blood from his face, caused by the blows, and lay down upon a bed. He thereafter, the same night, with his wife and child, drove to his own home, at which place he was later arrested.

John Weigant, Jr., a boy not quite fifteen years old, testified that he was standing at the door of his father's house—the house one hundred feet south of the Frank house—when Piel came out of the latter house; that Kerber and the other men had stepped to the corner of the Weigant house, a few feet away; that when Piel came out of the Frank house, he had his hand in his coat pocket, and held a knife therein, with a blade five inches long; that he came down talking, and when he got near to Kerber the latter said: "Stand back, I don't want to speak to you;" that as Kerber said: "Stand back," Piel "struck at George Kerber and George Kerber struck. He had turned Jim Wray out between the two. Then when Jim Wray was out, Piel went around, and Kerber picked up a board, and when he was about to strike, he stabbed him, and then he dropped the board and hit him a little bit with the board, and then he ran around the barn and when he came back he was stabbed."

Other evidence shows that deceased and defendant lived upon the same farm within two hundred feet

of each other; that they were employed by the same man; that deceased visited at defendant's home, and the two were good friends.

No exceptions were taken at the trial to the decisions of the court in admitting or rejecting evidence, or to the instructions given to the jury in behalf of the people. The defendant made no request for instructions. The only exceptions taken were to the decision of the court in overruling the motion for a new trial, the refusal of the court to allow the filing of a motion in arrest of judgment, and to permit counsel at the time of sentence, to interpose objections and exceptions to the instructions given. It is proper to say that counsel, representing defendant here did not represent him at the trial below, and here urge many matters which they conceive to be erroneous.

Under the authority vested in us, and the forms of law prescribed, we have no power to decide matters which in no legal manner have been submitted for our consideration.—*Smith v. People*, 1 Colo. 121; *Noble v. People*, 23 Colo. 9; *Chipman v. People*, 24 Colo. 520, 523; *Keady v. People*, 32 Colo. 57, 64; *Weaver v. People*, 47 Colo. 617, 618.

Were we to assume that defendant had a right to file a motion in arrest of judgment, the denial of such right in no wise prejudiced him. No alleged error exists in support of such motion, which can not, without the motion, be properly presented for determination. Defendant's counsel practically concede this. They admit that a motion in arrest of judgment, that does not affect the real merits of the offense charged, should be denied, and that they are not in a position to advance any special grounds why the motion, if filed, should have been sustained.

Under the condition of the record, the only matter which we can consider is, whether the evidence is sufficient to support the verdict and sentence?

We are not impressed with young Weigant's testimony. He is in no wise corroborated. Other witnesses having better opportunity than he, saw no knife until after the fistic encounter. It is very clear that, while the blows with the fists were being struck, defendant had no knife in his hand. If young Weigant saw a knife with a blade five inches long, enclosed in defendant's hand, protruding from his coat pocket, as he passed from the house towards the barn, it was not the knife the other witnesses saw, including those for the state, and with which the fatal blow was struck. Moreover, the altercation occurred in the dusk of the evening when it was difficult for those in the immediate presence of the combatants to see distinctly what took place, making it very improbable that young Weigant, at a distance of one hundred feet, could see a knife blade sticking out of a coat pocket.

In denying defendant's application for leave to file a motion in arrest of judgment, the trial court stated, among other things: "I have no pardoning power; clemency does not rest with me, it rests with the governor. The jury has convicted this man and found him guilty of murder in the first degree. This is not a strong case. I have known of stronger cases where the defendant has gone scott free. I have tried murder cases in this district stronger than this where the man was acquitted; but that does not matter. There is evidence upon which to base this verdict."

While it is the peculiar province of the jury to determine the issues of fact, when they have done so, and the sufficiency of the evidence to support their verdict is

challenged, it becomes the duty of the trial court to care-
fully weigh and consider all the evidence and the facts
and circumstances in the case, and unless satisfied with
the verdict to such an extent that its reason and judgment
approve it, a new trial should be granted.   And "the
approval of a verdict does not mean that formal approval
which is inferred from the act of rendering judgment on
it, but it means the assent and approval of the mind,
after due consideration; and when the mind of the court
refuses to concur in the correctness of a verdict, and its
honest convictions lead it to believe that it ought to have
been for the other party, then the verdict is not sup-
ported by the evidence so as to merit its approval, for in
passing on a motion for a new trial, it is the court and
not the jury that must weigh and determine the effects
of the evidence.   It cannot be said that a court approves
a verdict when its reason and judgment rebel against the
conclusion it expresses.   The rule requiring a juror to
be satisfied with the verdict is no stronger than the rule
which makes it the duty of the trial court to approve or
disapprove a verdict as dictated by its own conscience and
judgment.   It may be here suggested, however, that, as
one juror may yield his opinions and accept those of the
other jurors, so may the court yield his impressions or
opinions and adopt those of the jury; but such surren-
dering of his own views must be the result of considera-
tion and reasoning, and can only be done where it,
through such process, finally, reaches the conclusion that
the verdict is right and, by reason thereof, approves it."
—*Yarnell v. Kilgore*, 15 Okla. 591, 593.

And in *Hogan, et al. v. Bailey*, 110 Pac. 890. 892,
the same court said:   "The trial court has a higher func-
tion under our jurisprudence than to act merely as a
moderator or umpire between contending adversaries be-

fore a jury. Not only is it charged with the duty of seeing that the course and conduct of the trial gives to each of the litigants a fair opportunity to present his cause, and to have the facts weighed in the light of proper instructions declaring the law relative thereto, but it is the imperative, abiding duty of the court, after the jury has returned its verdict, and awarded to one or the other success in the controversy, where the justness of the same is challenged as in this case, to carefully weigh the entire matter, and, unless it is satisfied that the verdict is responsive to the demands of justice, to set the verdict aside and grant a new trial. Not only must the jury be satisfied of the righteousness of the conclusion to which it arrives, but, unless that conclusion meets the affirmative, considerate approval of the mind and conscience of the court, it should not, where challenged, be permitted to stand."

In *State v. Bridges*, 29 Kan. 138, 142, it is said: "Even in a civil case, when the judgment of a trial judge tells him that the verdict is wrong, that whether from mistake, or prejudice, or other cause, the jury have erred and found against the fair preponderance of the evidence, then no duty is more imperative than that of setting aside the verdict and remanding the question to another jury. *Railway Co. v. Kunkel*, 17 Kan. 145.) In a criminal case this duty is still more important, and a trial judge ought never to sentence a prisoner upon a verdict which is properly challenged, unless he is willing to declare that the verdict of the jury should be accepted as just."

When it appears to the trial court, exercising a sound judgment, that the jury have found against the weight of the evidence, it is the imperative duty of such court to set the verdict aside. We repeat and adopt the language of Mr. Justice Brewer in *K. P. Railway Co. v. Kunkel*,

17 Kan. 145, 172, where he said: "We do not mean that he (the trial judge) is to substitute his own judgment in all cases for the judgment of the jury, for it is their province to settle questions of fact; and when the evidence is nearly balanced, or is such that different minds would naturally and fairly come to different conclusions thereon, he has no right to disturb the findings of the jury, although his own judgment might incline him the other way. In other words, the finding of the jury is to be upheld by him as against any mere doubts of its correctness. But when *his judgment* tells him that it is wrong, that, whether from mistake, or prejudice, or other cause, the jury have erred, and found against the fair preponderance of the evidence, then no duty is more imperative than that of setting aside the verdict, and remanding the question to another jury."

Moreover, it has been the unvarying rule of this court to permit no verdict to stand, unless both the jury and the court, trying the cause, could, within the rules prescribed, approve the same.

In *Petite v. People,* 8 Colo. 518, 524, we said: "This court, in common with other courts of last resort, hesitates to assume the responsibility of nullifying the verdicts of juries on account of insufficient evidence to authorize the same. Such verdicts, as a rule, will not be molested unless there is reason to believe either that the jury must have been influenced by passion or prejudice, or that they misconceived the scope and effect of the evidence. But, under all the circumstances disclosed in the case at bar, we feel constrained to say that our duty commands us to interfere. * * * We cannot reasonably find, from the proofs in this record, sufficient warrant for the penalty of death; the jury must have misunderstood the evidence or misconceived its scope and effect."

The same rule is recognized in *Nilan v. People,* 27 Colo. 206, 213, where it is said: "* * * * we are impressed with the inadequacy of the evidence to prove either degree of murder."

And in *Hackett v. The People,* 8 Colo. 390, 391, speaking through Mr. Justice Helm, this court said: "But we reverse the judgment in this case willingly for another reason. Surprising as the fact may be, it is nevertheless true, that the verdict was not warranted by the evidence. * * * But, discarding entirely the accident theory, the evidence, at most, sustains only the conclusion that the fatal shot was fired in a sudden heat of passion, during a drunken brawl between companions; deceased having first choked Hackett, (the defendant), thrown him on the bed, and otherwise maltreated him."

No one can read the record before us without being impelled to the belief that the verdict is manifestly against the weight of the evidence. A doubt will certainly arise regarding the justice of such verdict, as it evidently did in the mind of the trial judge giving rise to his language hereinbefore quoted. In a case of this character, not only should the jury be convinced beyond a reasonable doubt before agreeing upon such a verdict, and fixing the penalty at death, but the trial court should likewise entertain a firm belief in the justness of the verdict before pronouncing judgment. Moreover, this court must be very certain that the verdict and judgment are justified by the weight of the evidence before we can sanction the infliction of the penalty here imposed. As said by Mr. Bishop in his work on Criminal Procedure, paragraph 80, (2d ed.): "If a man is charged with acts to which the law attached the penalty of imprisonment, and then he is hung for those acts, he is not punished, he is murdered. It is no more just to take his life on a charge of acts to

which the law affixes the punishment of imprisonment only, than it is to do the same thing without any charge."

Evidence may be offered at another trial which will sustain a like verdict to the one before us.  As the record is, we are unable to read therefrom, that premeditation and express malice essential to constitute murder in the first degree.  The judgment is, therefore, reversed.

*Judgment reversed.*

*En banc.*

CHIEF JUSTICE CAMPBELL and Mr. JUSTICE GAR-RIGUES not participating.