[No. 8649.]

## JONES V. THE PEOPLE.

CRIMINAL LAW—*Murder—Degree.* Conviction of murder in the first degree. No prior diffícutly had occurred between the parties, but the deceased had made threats against the life of the prisoner, had actually attempted to execute this threat, just before the firing of the fatal shot, and was preparing to repeat the attempt. The evidence was held insufficient to sustain the conviction, and a new trial was ordered. (41-44.)

*Error to Moffat District Court.* Hon. JOHN T. SHUMATE, Judge.

Mr. ALBERT C. CRAIG, Mr. WILL P. GREEN, and Mr. GEORGE G. ROSS, for plaintiff in error.

Hon. FRED FARRAR, Attorney General, and Mr. CLEMENT F. CROWLEY, Assistant Attorney General, for The People.

Mr. Justice BAILEY delivered the opinion of the court.

Plaintiff in error, John Jones, hereinafter referred to as defendant, was tried and convicted of first degree murder, for the killing of Bale Herndon, known also as Mack McGinty. The penalty was fixed at death, and Jones brings the case here for review.

About one o'clock in the afternoon of September 14th, 1913, the day upon which all the facts herein recited occurred, the defendant, a negro employed as a cook at the Nevin

ranch, in Moffat County, the deceased, a sheep herder in that county, and one Felix Meyer, were engaged in playing a game of poker in a two-room cabin on that ranch, where the killing took place. At one hand in the game defendant won from deceased, whereupon the latter in anger destroyed a portion of the deck of cards which they were using, but the game continued until about three o'clock, without further display of ill-temper upon the part of any participant. The defendant and the deceased decided to make Meyer stay there over night, and to effect their purpose turned his horse loose; but the latter, being about $3.50 looser by the game, determined to go, caught his horse and left the ranch. About four o'clock Philipe Garcia, a Mexican employed as sheep herder on the ranch, came to the cabin. Near five o'clock the defendant, the deceased and Garcia were in the larger of the two rooms of the cabin, the latter, having just returned to the cabin from milking, had strained the milk and was standing by the stove. The defendant testified that shortly prior to this time the deceased engaged him to play at cards, the game of seven-up, for a stake of twenty-five cents each; that he, defendant, won the hand, and thereupon told deceased he did not want to play longer, that deceased could not play the game, and gave back the twenty-five cents he had won; that deceased then took up his rifle threatening to kill defendant; that defendant remonstrated with deceased, offered to get him another drink of whisky, and was moving toward the door leading into the other room, which was occupied by defendant as a bedroom, when deceased fired a shot at him; that he, defendant, quickly seized a shot gun standing near, presumably just inside of his bedroom door, and fired both barrels of the weapon at the body of deceased, while the latter was in an attitude of shooting at him a second time. Garcia, the only other living witness to the affair, testified that when he first came to the cabin, that afternoon, deceased was out in the blacksmith shop,

fixing some coyote traps, and when he, Garcia, returned from milking, deceased was sitting in the doorway of the cabin, rifle in hand; and told him that he was going to kill the negro, because he was dirty and no good; that in response to his telling the deceased not to do such a thing he was told to get away, whereupon he, Garcia, went into the house with the milk, and deceased immediately followed him, flashing the rifle and cursing the defendant; that deceased shot at defendant, and defendant then immediately shot deceased with the shot gun, while the latter was attempting to reload his rifle. Tests subsequently made with the shot gun used by defendant show that the shots were fired upon deceased at close range, ten feet to ten steps, more probably not farther than ten feet. The rifle used by deceased was found inside the larger room, standing against the wall, or partition between the two rooms, containing in its chamber the shell of a discharged cartridge. How the rifle got there does not appear. The charges of shot fired by defendant severely mutilated one arm of the victim, penetrating the side of the chest, and causing death four or five hours later. While in extremity the deceased declared that he did not shoot at defendant. There is evidence of the drinking of intoxicants by the parties during the afternoon, and that they were so engaged shortly before the shooting, though the extent of the indulgence, and its effect upon either of them, does not appear. No prior difficulty between them is disclosed; on the contrary, it appears that they were at all times up to the threat by deceased upon friendly terms.

Does the evidence support the verdict and warrant the penalty of death? The killing is admitted by the defendant, but it is claimed the fatal shots were fired because the deceased not only threatened to take his life, but fired a shot at him, and assumed an attitude of firing a second time. Certain salient facts of weight and importance are disclosed by the evidence. These men were friends, and if enmity

existed between them it was upon the part of the deceased, exhibited for the first time just prior to his firing a shot at defendant. Defendant fired upon deceased as soon after the shot by the latter as he could secure his shot gun, which was close at hand. There is no proof which raises a suspicion even, that the killing was done for personal gain, or in a spirit of revenge, anger, hatred, jealousy, or the like, and consequently the only motive prompting it appears from the statements of defendant and Garcia, that deceased fired first upon his threat to kill, and was in the attitude of firing again. As suggested by counsel for the people, it was entirely within the province of the jury to disbelieve this testimony, but if it did so, then it must have fixed as a punishment for the act the highest penalty which the law can exact, solely upon the fact of the killing, coupled with the declaration made by deceased, on his death bed, to the effect that he did not shoot at defendant, but defendant shot him. The record clearly shows that this was a sudden and impulsive killing, resulting from a situation in which the deceased placed himself, by at least aggressive and threatening conduct toward the defendant with a loaded rifle, and according to the decided weight of the testimony, by firing a shot therefrom at him. The conclusion is irresistible that the jury must have been influenced by passion or prejudice in returning such a verdict upon such proofs.

In the case of *Petite v. People*, 8 Colo. 518, 9 Pac. 622, reversing a judgment of murder in the first degree with penalty fixed at death, the court said:

"This court, in common with other courts of last resort, hesitates to assume the responsibility of nullifying the verdicts of juries on account of insufficient evidence to authorize the same. Such verdicts, as a rule, will not be molested unless there is reason to believe either that the jury must have been influenced by passion or prejudice, or that they misconceived the scope and effect of the evidence.

But, under all the circumstances disclosed in the case at bar, we feel constrained to say that our duty commands us to interfere. No part of the charge is contained in the record, save the instruction mentioned, and we must assume, therefore, that the law was correctly stated. But we cannot reasonably find, from the proofs in this record, sufficient warrant for the penalty of death; the jury must have misunderstood the evidence or misconceived its scope and effect.

If the accused, without premeditation or deliberation, voluntarily took the life of deceased, when it was not absolutely necessary in order to protect his own life, or to prevent great bodily harm, or when it would not have so appeared to a reasonable and prudent man, he undoubtedly deserves to be punished. The penalty, however, prescribed by law for such an offense, whether it be murder in the second degree or manslaughter, is not the one here pronounced."

The facts in the case of *Piel v. People,* 52 Colo. 1, 119 Pac. 687, show a situation similar to that in the present case. There the death penalty was imposed, and the court in reversing the judgment said:

"No one can read the record before us without being impelled to the belief that the verdict is manifestly against the weight of the evidence. A doubt will certainly arise regarding the justice of such verdict, as it evidently did in the mind of the trial judge giving rise to his language hereinbefore quoted. In a case of this character, not only should the jury be convinced beyond a reasonable doubt before agreeing upon such a verdict, and fixing the penalty at death, but the trial court should likewise entertain a firm belief in the justness of the verdict before pronouncing judgment. Moreover, this court must be very certain that the verdict and judgment are justified by the weight of the evidence before we can sanction the infliction of the penalty here imposed. As said by Mr. Bishop in his work on Criminal Procedure, paragraph 80, (2nd ed.) : 'If a man is charged with

acts to which the law attached the penalty of imprisonment, and then he is hung for those acts, he is not punished, he is murdered. It is no more just to take his life on a charge of acts to which the law affixes the punishment of imprisonment only, than it is to do the same thing without any charge.' "

We are fully persuaded that the record does not disclose a state of facts upon which a verdict of first degree murder can properly be predicated, and that it was the duty of the court below to so instruct the jury. The evidence utterly fails to establish such a wilful, deliberate and premeditated killing as is contemplated by the statute to constitute that degree of murder for which the verdict was returned, and therefore, upon the authority of the foregoing decisions, the judgment of the court below is reversed and the cause remanded for a new trial in conformity with these views.

*Judgment reversed and cause remanded.*

Decision *en banc.*

CHIEF JUSTICE GABBERT and Mr. JUSTICE WHITE dissent.

Mr. JUSTICE TELLER not participating.

Mr. JUSTICE WHITE dissenting:

The record, I think, contains ample evidence to support the verdict, and this should readily appear to whomsoever will turn thereto, and read it. I shall not undertake to review it herein, but will content myself with saying that the jury was warranted therefrom in concluding that the homicide was a deliberate and premeditated murder perpetrated by the defendant. This was within the province of the jury and the verdict, having been approved by the trial court, in whose presence the witnesses testified, we should not interfere but affirm the judgment.

I am authorized to state that Chief Justice Gabbert concurs in what I have said.