## No. 12,651.

KOLKMAN *v.* THE PEOPLE.
(300 Pac. 575)

Decided May 11, 1931.

Mr. JAMES P. VEERKAMP, Mr. S. D. CRUMP, for plaintiff in error.

Mr. ROBERT E. WINBOURN, Attorney General, Mr. JOHN S. UNDERWOOD, Attorney General, Mr. SIDNEY P. GODSMAN, Assistant, for the people.

*En Banc.*

MR. JUSTICE ALTER delivered the opinion of the court.

JOHN Kolkman, Roy Kolkman, J. B. Morrison and William Morrison, fathers and sons respectively, were jointly charged with the crime of grand larceny. The court granted the Morrisons a separate trial. Upon the trial of the Kolkmans, John was convicted and sentence pronounced, while the jury failed to agree upon a verdict as to Roy. John Kolkman, who will hereinafter be referred to either by name or as defendant, prosecutes this writ, seeking a reversal because of two alleged errors occurring during the proceedings, i. e., (1) Refusal of the trial court to grant his motion for a separate trial; (2) the trial court's comments to the jury.

The record discloses that, on February 14, 1929, an information was filed in the district court, and the capias issued thereon was made returnable at the March, 1929, term of court; it also shows the apprehension of the Kolkmans, and the giving of bonds for their appearance; on March 10, 1930, the Kolkmans filed their verified joint motion to disqualify the trial judge, which motion was on that day denied; on March 21, 1930, the Kolkmans filed their joint motion to quash the information, which motion was also on that day denied; on March 21, 1930, the Kolkmans filed their joint motion for a continuance, which motion was supported by their joint affidavit and

was granted, and the case set for trial on April 14, 1930. On March 21, 1930, the Kolkmans each verified separate motions for separate trials, which motions were identical in every respect, except as to the name of the moving party, but which were not filed until April 14, 1930, just as court had convened for the trial of the Kolkmans. The motions were denied, and the trial followed immediately. The record also discloses that the Kolkmans were represented throughout the entire proceedings by counsel who represent John in this court.

1. The pertinent parts of the motions for a separate trial are:

"1. That there will be evidence offered on behalf of the People which will not and does not relate to the reputation of this defendant, but which will be material and admissible against said defendant, John Kolkman, if tried jointly with this defendant, but which would be immaterial, incompetent and inadmissible as to this defendant, and which would be prejudicial to his rights."

"2. That evidence will be offered on behalf of the People at the trial of this case which will be highly prejudicial to this defendant and which will be wholly incompetent and irrelevant as to this defendant, but which will be material and competent as against said John Kolkman, and which prejudicial evidence will necessarily reach the ears of the jurors, whereby the constitutional rights of this defendant to an impartial trial to a jury will be violated and the liberty of this defendant jeopardized without authority of law, and this defendant is informed and, therefore, alleges that it is the intent and purpose of the district attorney to offer in evidence certain statements, confessions, conversations and acts of the defendants, J. B. Morrison and William Morrison, and other witnesses and alleged acts, statements, conduct and conversations of defendant, John Kolkman, not made or done in the presence of this defendant or participated in by him, all of which will be competent and material evidence as against the defendant, John Kolkman, but

12

not as against this defendant, and that certain documents, letters, papers and other written evidence will be competent as against defendant John Kolkman, but not as against this defendant, will be offered in evidence to the great prejudice of this defendant; that this defendant cannot more definitely advise the court as to what the testimony to be offered by the People and which may or will be competent as against John Kolkman, and wholly incompetent and prejudicial as to the defendant, will be, and this moving defendant says that if he is compelled to proceed to trial under the information filed herein and in this case upon a joint trial of the two remaining defendants (while he is wholly innocent of the charge filed against him) he will be greatly prejudiced and his constitutional rights will be violated and his right to a separate trial under the law of the land and the statutes of the State of Colorado will be denied."

■ We have held that, unless the bill of exceptions discloses the admission of prejudicial evidence, no error is committed in denying a motion for a severance; *Stone v. People,* 71 Colo. 162, 167, 204 Pac. 897; *Sarno v. People,* 74 Colo. 528, 531, 223 Pac. 41.

■ We have also held that the motion for a severance, or the affidavit supporting the same, must set forth the incompetent and prejudicial evidence so as to advise the trial court in determining the question of granting or denying the motion; *Robinson v. People,* 76 Colo. 416, 419, 232 Pac. 672; *Garcia v. People,* 88 Colo. 267, 295 Pac. 491.

The defendant seeks to avoid the rule announced in the Robinson and Garcia cases, supra, by alleging in his verified motion for a separate trial that he "cannot more definitely advise the court as to what the testimony to be offered by the People and which may or will be competent as against Roy Kolkman, and wholly incompetent and prejudicial as to the defendant, will be," and, of course, if the truth of this statement is borne out by the evidence offered at the trial, the motion for a severance would not

be insufficient because of defendant's failure to do the impossible.

: The serious question raised by the assignment of errors relates to the admission of the evidence of witnesses J. B. Morrison, William Morrison, and one Denton with reference to acts, conversations, and admissions of Roy Kolkman when defendant was absent.

The evidence on behalf of the people was that in January, 1929, John Kolkman was at Morrison's house, near which lived a man named Burson, whose hogs were in a field near the Morrison house; defendant inquired of J. B. Morrison as to the ownership of the hogs, and was told to whom they belonged, and then defendant made the remark, "Why not let's get these hogs," to which Morrison replied, "Well we would get into it, would we not?" defendant replied, "Why no, we can take these hogs and take them up to my place and butcher them and nobody will ever know what went with them." Morrison further testified that about February 4, 1929, at a certain public sale, he had a conversation with defendant and Roy Kolkman with reference to the theft of the hogs, and in the evening of the same day the Kolkmans came to his place, and there and then it was determined between witness and the Kolkmans that the hogs should be stolen during the night and taken in the Kolkmans' truck to defendant's ranch, where they would be butchered next day, and the pork would be equally divided between witness, defendant, and Roy Kolkman; that pursuant to this plan, the hogs were stolen, trucked to the Kolkman ranch, and butchered the following day, and in the butchering, witness, his son, defendant, and others participated, but before the division could be made, the officers and the owner of the hogs took the pork out of defendant's possession. After the pork had been discovered, and that very night, John and Roy Kolkman went to the house where witness resided, and there, in the presence of William Morrison, entered into a discussion, and formulated plans for evading arrest and conviction. Following this

conference, witness was taken by defendant and Roy Kolkman to a farm where a man by the name of Pottsberg lived, and there it was stated by both defendant and Roy Kolkman that they had all been involved in the theft of Burson's hogs, and that the sheriff was after witness (J. B. Morrison), who also stated: "He was trying to get me out of the way so they could lay the blame on me until he could get it fixed up." Roy and defendant left witness at Pottsberg's house, and they said "they would get somebody down there to get me away from there the next morning." The next morning one Stevenson came to Pottsberg's and took witness to Aguilar, and delivered to him five hundred dollars, which according to previous arrangement between him and the Kolkmans, was to be sent with the man who came to move witness out of the country. Witness was left at Aguilar, where he remained for several days, when John Kolkman came to see him and inquired what he wanted, and the money witness had received having been lost or stolen, he replied: "I told him I wasn't going to leave until I got to see my wife and I had to have some money, they would have to get me some money to get away on, leave on." Defendant then left for his home, and in two or three days returned to Aguilar with witness' wife, and after witness had conversed with her a few moments, defendant said, "We better get out of here because the sheriff is liable to be here any minute." During the conversation between witness and defendant at Aguilar, defendant, according to witness, stated: "Him and Roy was to take my cattle and finish wintering them and summer them free of charge and I was to stay out of the way till they could get the thing straightened up, make it look like I was the guilty party and they would buy the prosecuting attorney off and Burson would get the thing straightened up so I could come back and it would be straightened for all of us." Defendant then took the witness to Memphis, Texas, where, after giving him forty dollars, he left him and returned to Colorado. Witness, using the name of

Joe Hoket, wired defendant for money on several occasions, and the money was sent to him either at Memphis or San Angelo. At San Angelo, Texas, defendant brought witness' wife to see him, and from there witness and his wife and defendant went to Big Springs, Texas, where it was arranged between them that defendant and witness' wife were to return to Colorado to get witness' car, and it was arranged that either defendant or Roy Kolkman was to return with the car and witness' wife to Big Springs. Roy returned with the car and wife, and all three went in the car to Amarillo, Texas, where Roy took the train and returned to Colorado. While at Big Springs, Roy telegraphed to defendant for one hundred dollars, which he gave to Morrison's wife. Witness then went to New Mexico, then to Oklahoma, back to Raton, New Mexico, and eventually returned to Colorado, where he was arrested and charged with the theft of the hogs. Witness, at Roy's solicitation, went to see the attorneys for the defendant for advice as to his constitutional rights with respect to testifying, and he testified that Roy told him "that him and John had everything fixed if I would sign a bunch of papers they had seen and they would release my bond and I would not have to come back and the case would be thrown out of court and there would be nothing to it."

William Morrison testified that he was present at the conversation between his father, defendant, and Roy Kolkman, at his father's house the night the pork was discovered, and that defendant stated something would have to be done, to which his father replied, "Yes, it looks like something had to be done." Witness further testified: "They wanted the old man to leave and he didn't want to, and he tried to get John to, and they said, 'No, John couldn't leave, he was under bond,' and the old man offered to pay half the bond he was under and Roy the other half and he wouldn't do that, and Roy claimed he couldn't leave because he had his outfit up there and he couldn't get away and they decided he would

leave and they was to give him a thousand dollars and fix this up for all of them while he was gone," and witness then testified that his father left that night.

Denton was merely a "go-between," and testified to conversations with Roy concerning ways and means of having the charges dismissed, and witness' efforts in that behalf.

Everything testified as having been said and done, in the absence of defendant herein, was objected to by him.

In *Van Wyk v. People*, 45 Colo. 1, 99 Pac. 1009, the defendants were charged with the crime of murder, and the trial court instructed the jury on the law of conspiracy, and this was assigned as error. Upon this question, at page 11, in disposing of this contention, this court said: "It is true that the defendants were not charged with having conspired and confederated together to kill and murder, but they were jointly informed against and charged with murder. Under this charge it was entirely proper to show a conspiracy on the part of the defendants to commit the offense, and the acts and declarations of one conspirator in furtherance of the common design were admissible against both the defendants;" * * *.

■ It is not necessary an information should charge a conspiracy, but although no conspiracy is charged, if it is made to appear that there was concerted action between codefendants, the acts and declarations of one are admissible against the other. 16 C. J. 647.

"While the commission of the crime to which a conspiracy relates will in many cases mark the accomplishment of its object and its consequent termination, so as to exclude evidence of subsequent acts or declarations of one conspirator against another, this is not necessarily true, but the conspiracy may continue for various purposes, as for instance * * * the division of such proceeds, the concealment of the crime, effecting an escape, the concealment of evidence tending to incriminate the conspirators, procuring witnesses to leave the state, * * * and where this is the case, the acts and declara-

tions of one conspirator are admissible against the others, where made while the conspiracy continued, although after the actual commission of the crime." 16 C. J. 661, et seq.

The evidence offered by the people, if believed by the jury, warranted it in finding that the Kolkmans and the Morrisons entered into a conspiracy to commit the crime of larceny; that the larceny was in fact committed, and before the division of the loot, and when the participants therein were in danger of apprehension, the original conspiracy continued; or that another conspiracy was entered into between all the parties to conceal the crime and evidence thereof, so that punishment might not be suffered thereafter. In either event, the position of the parties is not changed; they were coconspirators, if the evidence of the people is to be believed, and as such the acts and declarations of one are admissible as against the other.

The gravamen of the offense charged is not conspiracy but larceny. Evidence of such conspiracy is admissible to prove the crime charged. Where, as here, the conspiracy was entered into between defendants jointly charged and tried, having for its object not only the crime charged, but escape from punishment therefor, evidence thereof is proper for the purpose of showing a consciousness of guilt.

In *Byrd v. State,* 68 Ga. 661, the syllabus correctly supports the holding of the court, and is: "The acts and conduct of one accomplice during the pendency of the wrongful act, not only in its perpetration, but also in its subsequent concealment, are admissible against the other."

In *Carter v. State,* 106 Ga. 372, 377, 32 S. E. 345, in commenting upon the rule announced in the Byrd case, supra, the court said: "It seems, therefore, under the decision of this court in *Byrd v. State,* 68 Ga. 661, that this evidence was admissible against Carter. In that case it was distinctly ruled that the acts and conduct of one

accomplice during the pendency of the wrongful act, not alone in its actual perpetration but also in its subsequent concealment, were admissible against another accomplice. This holding was doubtless based upon the idea that the criminal enterprise was still pending while the conspirators continued to be active in taking measures to prevent the discovery of the crime or the identity of those connected with its perpetration.''

''Acts of the parties, although after the consummation of the crime, done for the purpose of escaping detection are admissible.'' 3 Enc. of Ev. 432.

It is evident from the testimony of Jim Morrison that, at the time the larceny of the hogs was first suggested to him by defendant, he had in mind the fear of detection and punishment, and this fear was allayed by defendant's remark as to how the theft could be accomplished and concealed, and detection and punishment evaded. It is also obvious that when the pork was found, and taken into the possession of the officers and the owner, that, according to the Morrisons' testimony, another separate and distinct conspiracy was entered into between all the parties, including this defendant, the purpose and object of which being to avoid apprehension, arrest, conviction, and punishment. If the first conspiracy extended beyond the commission of the larceny, for which defendant was tried, or if the latter conspiracy was entered into, as witness testified, all the acts and declarations of all the parties connected therewith and pertaining thereto were admissible as to this defendant.

''The common design of a criminal enterprise may extend, however, as appellant concedes, beyond the point of the commission of the act constituting the crime for which the alleged conspirator is on trial. * * * The reasonable inference to be drawn from the foregoing evidence is that all of these subsequent acts were consummated in the execution of a scheme to evade arrest and escape punishment, and, therefore, under the rule of the authorities cited, the trial court was justified, we think,

in receiving the evidence in order that the jury might determine whether or not the original conspiracy extended up to and included the scheme to escape, and, if so, whether the act of the Broses in registering under an assumed name was in pursuance thereof." *People v. Lorraine,* 90 Cal. App. 317, 327, 265 Pac. 893, 897.

To the same effect see: *State v. Arnold,* 84 Mont. 348, 275 Pac. 757, 760; *People v. Sampsell,* 104 Cal. App. 431, 286 Pac. 434, 437; 1 *Greenleaf on Evidence,* (16th Ed.) 305, note 2; *State v. Pettit,* 74 Wash. 510, 133 Pac. 1014, 1019; *State v. Gauthier,* 113 Ore. 297, 307, 231 Pac. 141; *Scott v. State,* 30 Ala. 503, 510; *Miller v. Dayton,* 57 Ia. 423, 429, 10 N. W. 814; *Commonwealth v. Scott,* 123 Mass. 222, 235; *Sanders v. State,* 35 Okla. Cr. 139, 249 Pac. 356, 357; *Allen v. Commonwealth,* 176 Ky. 475, 485, 196 S. W. 160; *O'Brien v. State,* 69 Neb. 691, 693, 96 N. W. 649; *People v. Fox,* 269 Ill. 300, 322, 110 N. E. 26; *People v. Pitcher,* 15 Mich. 396, 402; *State v. Pratt,* 121 Mo. 566, 572, 573, 26 S. W. 556; *People v. Mol,* 137 Mich. 692, 707, 100 N. W. 913; *State v. Roberts,* 95 Kan. 280, 147 Pac. 828, 831, 832; *Carter v. State,* 106 Ga. 372, 376, 377, 32 S. E. 345; *State v. Dilley,* 44 Wash. 207, 87 Pac. 133, 136.

As such evidence would have been admissible had defendant been tried separately, there was no prejudicial error in denying the motion for a separate trial.

The trial judge, pursuant to the authority granted by our rule 14b, after the written instructions had been read to the jury and counsel had completed their arguments, commented to the jury upon the evidence as follows:

"Gentlemen of the Jury: There are four defendants named in the information. All four of these defendants have testified in this trial. Only two of the defendants, viz.: John Kolkman and Roy Kolkman, are on trial. The two Morrisons who are named as defendants are not on trial here.

"There is a direct conflict between the evidence offered by the two Kolkmans who are on trial and that given by the two Morrisons who are also defendants. The two

Morrisons have testified for the State. The court believes that the evidence when taken as a whole and all the circumstances as they have been presented here show that all four of these defendants are equally involved in the crime charged in the information and all four stand equally before the law in the same position.

"These comments that the court makes are not binding upon you. You are to make your finding and return your verdict as you may find the evidence warrants."

Counsel for defendant interposed the following objection: * * * "that it invades the province of the jury, and denies to the defendant his constitutional right to a trial by a jury." In view of the importance of the question and its novelty in this jurisdiction, it has seemed advisable to fully consider and discuss possible objections not specifically urged by defendant's counsel.

Our rule 14b reads as follows: "The rules governing comments by district judges on evidence shall be those now in force in the United States district courts."

Our rule 14b was unanimously adopted on July 1, 1929; became effective on September 1, 1929, which was subsequent to the commission of the alleged offense, but prior to the trial therefor. It may be contended that there is no printed rule in the United States courts permitting comments on the evidence by trial judges, and therefore our rule is indefinite and uncertain. So far as we are aware the premise is correct, but the conclusion is wrong. We have caused to be printed and distributed among the profession "Rules of the Supreme Court of the State of Colorado, 1929"; but it should not be assumed that every rule adopted and effective in the state of Colorado can be found within its covers, for in the recent case of *Parker v. Plympton*, 85 Colo. 87, 96, 273 Pac. 1030, it is said: "Many of our rules of practice and procedure are printed in a separate book, appropriately labelled, and distributed free to the attorneys practicing before this court. But a vast number of such rules are contained in the printed reports of our decisions, promulgated as jus-

tice demanded, and when the occasion therefor arose. Manifestly they are too numerous to make it possible to put them all in one book, but they are as binding as if they were all contained between two covers, and there should be no misunderstanding as to the meaning of the one stated as often as this has been.''

The word ''rules,'' as the same is used and intended in our rule 14b, is synonymous with practice, procedure, custom, method, and/or system. It seems passing strange that no one empowered under this rule has indicated any doubt as to the meaning thereof, or the extent of his power and duty thereunder. It was our intention in adopting the rule to advise the district judges in our courts that they possessed the same rights and duties as judges in the United States district courts with reference to comments upon the evidence; the wisdom and purpose of the rule was for us to determine; it was unanimously adopted, pursuant to what we believed to be our right and duty; we thought it to be a step forward in keeping with modern ideas of practice and procedure, and, by it, we intended to advise the profession that, in this respect, they might thereafter expect trials to be conducted in the state courts the same as they were conducted in the United States district courts. If we have failed in this purpose, it is because the imperfections of the English language preclude a more definite, certain, and comprehensive statement of the rule, and until some one more adept in its use submits a rule more clearly expressing and defining the intention of those who promulgated it, we must ask the profession to accept and use it in its present form. The only objection to our rule comes from those who doubt its wisdom; from those who are loath to see any advance in procedural methods in the trial courts, and when the rule is challenged as indefinite and uncertain, may it not be supposed that the real objection is to the rule itself, rather than a criticism of the language in which it is couched. It should be noted that some of the ablest writers of today approve and commend the prac-

tice and procedure which our rule permits. See: The Law of Evidence, Wigmore et al., 1927; Journal of the American Judicature Society, June, 1930, p. 8; Illinois Law Review, Vol. 23, p. 276; American Bar Association Journal, Vol. 12, p. 599; Harvard Law Review, Vol. 34, p. 424.

In other portions of this opinion reference is made to the "common law of England" as it was adopted by our territorial and state legislatures, and it should be noted from the act itself that the language used in adopting this "common law" is little longer than the rule under discussion, and yet it covers a subject infinitely greater in its scope; affecting more rights, and called into almost daily use by our profession, and no one has yet seriously objected to it as indefinite and uncertain, and its scope, so far as we are advised, has never been challenged, nor have serious controversies arisen as to its intent and meaning.

It cannot seriously be questioned that the rule (the term being used as hereinbefore defined) in the federal district courts permits comments by the trial court upon the evidence.

In *Carver v. Jackson (Astor)*, 29 U. S. 1, 79 (4 Pet. 1), Mr. Justice Story, in determining the right to do so, said: "With the charge of the court to the jury, upon mere matters of fact, and with its commentaries upon the weight of evidence, this court has nothing to do. Observations of that nature are understood to be addressed to the jury, merely for their consideration, as the ultimate judges of matters of fact; and are entitled to no more weight or importance than the jury, in the exercise of their own judgment, choose to give them. They neither are, nor are they understood to be, binding upon them, as the true and conclusive exposition of the evidence."

In *Smith v. Carrington*, 4 Cranch (U. S.) 62, 71, Mr. Chief Justice Marshall, in speaking of an exception to the refusal of a trial judge to charge on the evidence, said: "There can be no doubt of the right of a party to

require the opinion of the court on any point of law which is pertinent to the issue, nor that the refusal of the court to give such opinion furnishes cause for an exception; but it is equally clear that the court cannot be required to give to the jury an opinion on the truth of testimony in any case.''

In *Vicksburg Co. v. Putnam,* 118 U. S. 545, 553, 7 Sup. Ct. 1, Mr. Justice Gray, in disposing of an exception to the trial court's comments on the evidence, which comments are particularly forceful and amount almost to the direction of a verdict, makes this interesting observation upon the practice in the federal courts: ''In the courts of the United States as in those of England, from which our practice was derived, the judge, in submitting a case to the jury, may, at his discretion, whenever he thinks it necessary to assist them in arriving at a just conclusion, comment upon the evidence, call their attention to parts of it which he thinks important, and express his opinion upon the facts; and the expression of such an opinion, when no rule of law is incorrectly stated, and all matters of fact are ultimately submitted to the determination of the jury, cannot be reviewed on writ of error.''

In 7 Enc. U. S. Supreme Court Reports, p. 28, it is said: ''It is the usual practice for the presiding judge at a nisi prius trial, in his charge to the jury, to take up the facts and circumstances in proof, explain their bearing on the controverted points, and declare what are the legal rights of the parties arising out of them.''

At page 50, Id., after quoting verbatim the language of Mr. Justice Gray in *Vicksburg Co. v. Putnam, supra,* it is said: ''And this rule applies both in civil and criminal cases. But there is no rule that compels the court, in making such statement, to recapitulate all the items of the evidence, nor even all bearing upon a single question. There are, however, limitations on the power of a federal court, in commenting on the facts of a case when instructing a jury; limitations inherent in and implied from the very nature of the judicial office.''

24

At page 49, Id., the author has this to say with reference to the practice in the state courts: "In some of them [state courts] the court neither sums up the evidence in a charge to the jury nor expresses an opinion upon a question of fact. Its charge is strictly confined to questions of law, leaving the evidence to be discussed by counsel, and the facts to be decided by the jury without commentary or opinion by the court. But in most of the states the practice is otherwise; and they have *adopted the usages of the English courts of justice,* where the judge always sums up the evidence, and points out the conclusions which in his opinion ought to be drawn from it; submitting them, however, to the consideration and judgment of the jury."

In Wharton's Criminal Procedure (10th Ed.), vol. III, p. 2176, §1736, it is stated: "A judge has a right to express his opinion to the jury on the weight of evidence, and to comment thereon as much as he deems necessary for the course of justice, and an erroneous opinion on matter of fact, it is said, expressed by the judge in his charge, is no ground for new trial, unless the jury are thereby led to believe that such fact was withdrawn from their consideration."

The extent to which a trial judge may go in commenting on the evidence is set forth in *Cook v. United States,* 18 Fed. (2d) 50, 52, wherein it is said: "* * * we think the line of demarcation between what a court may say to the jury in a criminal case in expressing his opinion on the facts, and what he may not say, is to be drawn between mere expression of opinion not partaking of such argumentative nature as to amount to advocacy, leaving to the jury absolute freedom to determine the facts, and such discussion as amounts to an argument and makes the court in fact an advocate against the defendant. A trial judge is not merely a moderator or umpire; neither is he an advocate."

For recent cases illustrating the extent to which a trial judge may comment upon the evidence, see: *Buchanan v.*

*United States,* 15 Fed. (2d) 496, 497; *Morris v. United States,* 19 Fed. (2d) 131, 133; *Egan v. United States,* 22 Fed. (2d) 776, 778; *Eddington v. United States,* 24 Fed. (2d) 50, 51. See also: *Reynolds v. United States,* 98 U. S. 145, 167, 25 L. Ed. 244. See also: *Starr v. United States,* 153 U. S. 614, 624, 14 Sup. Ct. 919, for the rule and interpretation thereof.

Counsel for defendant call our attention to the recent case of *Bogileno v. United States,* 38 Fed. (2d) 584, 587, where the trial court was reversed because of comments. In that case, Bogileno was being tried for bribery, and the only question in dispute was the intent with which the plaintiff in error paid the money. The trial court in its comments said: "The question is that this defendant, having been arrested and in the custody of the government—whether he offered this bribe to induce them to drop the charges or not to appear as witnesses against him. The evidence on that point is that he gave the officers, after a discussion with them, $400. He admits he gave them money. *He admits he gave it for that purpose, so there can hardly be a dispute about that fact. * * *￼* In this case as I see it there is very little dispute in the evidence. *He admits he gave the money, and gave the money for the purpose of bribery.*" (Italics ours.)

The Circuit Court of Appeals, in an opinion by Judge Lewis, in reversing the judgment, said, in part: "The instructions were brief, covering less than two pages, and we cannot believe that these two excerpts failed to impress the jury. In substance they seem to us to be equivalent to an instruction to find the defendant guilty, which is beyond the right and authority of the court to do. It was the exclusive duty of the jury to determine whether he gave the $400 to induce the agents to drop the charges or not to appear as witnesses against him. *He did not admit that he gave it for that purpose, or for the purpose of bribery. He testified that he gave it for another purpose.* The purpose he assigned may have impressed the court as unreasonable and even un-

believable, but the court could not pass upon that. It was a question for the jury. The question of his intent was an issue of fact, and not of law, for the jury's determination. The conclusion that the excerpts were prejudicial to the defendant cannot be escaped.'' (Italics ours.)

It will be observed that, in the Bogileno case, supra, the appellate court determined that the judge's statement of facts, and his comments thereon, were incorrect, and that the comments were tantamount to a direction to the jury to find the defendant guilty.

In *Leslie v. United States,* 43 Fed. (2d) 288, 289, the comments which necessitated a reversal were, in part: ''It seems to me, gentlemen, that this defendant is guilty of this crime; it seems to me that he has put up a defense here that will not hold water under this evidence.''

██ We have found many federal cases approving language much more emphatic and drastic than in the instant case. The comments of the trial judge were very brief. Perhaps a more detailed and explicit resume or recapitulation of the evidence would have been more helpful to the jury, but this is a matter of which the defendant cannot complain. Comments are to be made in the discretion of the trial court.

In *Horning v. District of Columbia,* 254 U. S. 135, 41 Sup. Ct. 53, although there was little, if any, dispute as to the facts, the following comments were approved. ''In conclusion I will say to you that a failure by you to bring in a verdict in this case can arise only from a wilful and flagrant disregard of the evidence and the law as I have given it to you, and a violation of your obligation as jurors. * * * Of course, gentlemen of the jury, I cannot tell you in so many words to find defendant guilty, but what I say amounts to that.'' In determining this case, and with reference to these comments, Mr. Justice Holmes said, in part: ''Perhaps there was a regrettable peremptoriness of tone—but the jury were allowed the technical right, if it can be called so, to decide against the

law and the facts—and that is all there was left for them after the defendant and his witnesses took the stand. If the defendant suffered any wrong it was purely formal since, as we have said, on the facts admitted there was no doubt of his guilt."

In 16 C. J. 939, section 2308b, we find: "At common law, and in the absence of any constitutional or statutory restrictions, the trial court may, in its charge to the jury, comment on the evidence or express an opinion on disputed questions of fact, provided such questions are ultimately left to the jury for their decision, without any direction or advice as to how they shall find the facts; and this practice prevails in the federal courts. Where this practice prevails the opinion of the court properly may be expressed, either directly or inferentially, and the extent to which the court may discuss the evidence in submitting the case is generally within its sound discretion. Even strong expressions of opinion will be upheld, unless they amount to a binding instruction or a positive direction to find one way or the other. But the greatest caution should be used in the exercise of this power, and the jury should be left free and untrammeled in the determination of questions of fact which are to be passed on by them; and the court should not charge, as a matter of law, that a particular fact is or is not proved, even though the evidence is clear and uncontradicted."

Before the adoption of rule 14b, neither by the Constitution nor statute, were trial judges prohibited in our state from commenting upon the evidence, but there is direct authority for permitting them to do so. An act of our territorial legislature, adopted and approved on October 11, 1861, provided that the common law of England, as it existed prior to the fourth year of the reign of James I, with exceptions not herein important, was to be considered in full force and effect until repealed by the legislature. This act was adopted upon our admission to statehood, and re-enacted as section 156, General Laws of Colorado, 1877. It remains unchanged to this

day, and is found as section 6516, C. L. 1921. "James the I. was proclaimed king of England on the 24th of March, A. D. 1603." *Green v. People,* 3 Colo. 68, 69.

In 1861, the territorial legislature adopted and approved section 145, p. 321, Statutes of Colo., 1861, reading: "Section 145. All trials for criminal offenses shall be conducted according to the course of the common law, except when this act points out a different mode, and the rules of evidence also of the common law shall, unless changed by this act, be binding on all courts and juries in criminal cases."

This section was adopted by our first legislature (section 821, G. L. 1877) and, with the exception of an amendment, not herein important (Session Laws 1925, p. 227), is re-enacted as section 7099, C. L. 1921.

A search of the statutes of this state reveals that neither of the last two mentioned sections has been repealed, and, therefore, we must determine the common law procedure prior to the fourth year of the reign of James I. It was: "When the evidence is gone through on both sides, the judge, in the presence of the parties, the counsel, and all others, sums up the whole to the jury; omitting all superfluous circumstances, observing wherein the main question and principal issue lies, stating what evidence has been given to support it, with such remarks as he thinks necessary for their direction and giving them his opinion in matters of law arising upon that evidence." Cooley's Blackstone, book III, p. 376.

The right of a trial judge to comment upon the evidence was recognized and authorized at common law, and in adopting the common law, section 7099, C. L. 1921, we necessarily adopted that part thereof applicable to the trial of criminal cases. So far as we can determine, there is no statute inferentially or directly prohibiting comments upon the evidence. Experience has demonstrated that such practice has resulted in a much more successful and satisfactory administration than heretofore ob-

tained in our state courts. See: The Law of Evidence, Wigmore et al., Appendix A.

It may be said that cases have been reversed repeatedly by this court because of the comments and remarks concerning the evidence, inadvertently made by the trial judge during the course of the trial, and while this is true, it is also well to remember that the right to do so has never been defended or justified as a common law right, and, therefore, this court has never directly passed upon the question in the light of the common law, and section 7099, C. L. 1921. Irrespective of our rule 14b, so long as section 7099, C. L. 1921, remains upon our statute books, the right to comment upon the evidence is granted our trial judges.

██ ██ It may be said that the comments should be reduced to writing and submitted with other written instructions, and that counsel should be given the same opportunity of objecting thereto as to written instructions. The answer is that such comments are advisory; in no respect binding upon the jury, and hence are not instructions. Therefore, they need not precede the arguments nor be reduced to writing. "An instruction is an exposition of the principles of law applicable to a case, or to some branch or phase of a case, which the jury are bound to apply in order to render the verdict, establishing the rights of the parties in accordance with the facts proved." *Wickham v. People*, 41 Colo. 345, 351, 93 Pac. 478. Sections 7104 and 7105, C. L. 1921, expressly provide for written instructions covering the law in the case. There is nothing in the above sections pertaining to the comments on the evidence which of necessity concern the facts of the case rather than the law. To suggest that comments should be written and submitted to the jury with its instructions would result in unprecedented, novel, confusing, and pernicious practice; such has never been the practice, either in our federal or English courts, where comments are made orally after the arguments of counsel.

It may be said that since our rule became effective on September 1, 1929, it could not have any application to the trial for a crime committed prior to the date upon which it came into force and effect, and that to permit its use under these circumstances would be violative of the United States and Colorado Constitutions, with reference to ex post facto laws (Constitution of the United States, article 1, sections IX and X, and Constitution of the state of Colorado, article 2, section 11.) In our jurisdiction the question of ex post facto laws is discussed at length in *Garvey v. People,* 6 Colo. 559, 45 Am. Rep. 531, in which case support and authority is found in *Kring v. Missouri,* 107 U. S. 221, 2 Sup. Ct. 443, and from which latter case considerable of the opinion is quoted. In the Garvey case, supra, there were two, and only two, propositions urged by defendant's counsel, and the determination of the case must be read and understood in the light of these propositions, which were: "That after the commission of the alleged offense and before trial, the law applicable to such cases was so *amended* as *to change the rule of evidence and increase the punishment.*" and "That the law under which the offense was committed was repealed before trial, without a saving clause, and there was no law in existence when the trial was had against which the defendant had offended." In the decision in the Garvey case, supra, this court said: "this law [amended statute] *deprived* the prisoner of a *right of defense existing in his favor at the time of the commission of his crime, which, if employed, would have saved his life.* This right did not exist at the time of the trial, and the people, whose representatives had taken it away, could not be heard to say that the prisoner would not have availed himself of it." The facts in the Garvey case, supra, in the light of the discussion in the opinion, and the law announced with reference thereto, clearly distinguish it from the case at bar, and justify the statement that it can have no application to the case under consideration herein. The Kring-Missouri

case, supra, is so easily distinguished from the case at bar that little need be said with reference thereto except to call attention to the fact that it has recently been discussed and distinguished by the Supreme Court of the United States in the cases of *Beazell v. Ohio* and *Chatfield v. Ohio,* 269 U. S. 167, 46 Sup. Ct. 68. Beazell and Chatfield were jointly charged with a crime, and moved for separate trials under the provisions of an Ohio statute effective at the time of the commission of the offense which, by its terms, granted separate trials as a matter of right, upon motion. Subsequent to the commission of the offense, but prior to the trial therefor, the statute granting separate trials as a matter of right was amended so that thereafter the granting of separate trials should be discretionary with the trial judge. Defendants' motions were denied, and the defendants contended that this denial was error, because the amended statute was an ex post facto law, violative of the provisions of article 1, section 10, of the Constitution of the United States, providing that: "No state shall * * * pass an * * * ex post facto law, * * *." In discussing and disposing of this contention, the Supreme Court, in an opinion by Mr. Justice Stone, distinguished the Kring-Missouri case, supra, stating:

"Expressions are to be found in earlier judicial opinions to the effect that the constitutional limitation may be transgressed by alterations in the rules of evidence or procedure. See *Calder v. Bull,* 3 Dall. 386, 390; *Cummings v. State of Missouri,* 4 Wall. 277, 326; *Kring v. Missouri,* 107 U. S. 221, 228, 232. And there may be procedural changes which operate to deny to the accused a defense available under the laws in force at the time of the commission of his offense, or which otherwise affect him in such a harsh and arbitrary manner as to fall within the constitutional prohibition. *Kring v. Missouri,* 107 U. S. 221; *Thompson v. Utah,* 170 U. S. 343. But it is now well settled that statutory changes in the mode of trial or the rules of evidence, which do not deprive the accused

of a defense and which operate only in a limited and unsubstantial manner to his disadvantage, are not prohibited. A statute which, after indictment, enlarges the class of persons who may be witnesses at the trial, by removing the disqualification of persons convicted of felony, is not an ex post facto law. *Hopt v. Utah,* 110 U. S. 574. Nor is a statute which changes the rules of evidence after the indictment so as to render admissible against the accused evidence previously held inadmissible. *Thompson v. Missouri,* 171 U. S. 380; or which changes the place of trial, *Gut v. The State,* 9 Wall. 35; or which abolishes a court for hearing criminal appeals, creating a new one in its stead. See *Duncan v. Missouri,* 152 U. S. 377, 382.

"Just what alterations of procedure will be held to be of sufficient moment to transgress the constitutional prohibition cannot be embraced within a formula or stated in a general proposition. The distinction is one of degree. But the constitutional provision was intended to secure substantial personal rights against arbitrary and oppressive legislation, see *Malloy v. South Carolina,* 237 U. S. 180, 183, and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance. See *Gibson v. Mississippi,* 162 U. S. 565, 590; *Thompson v. Missouri, supra,* 386; *Mallett v. North Carolina,* 181 U. S. 589, 597.

"The legislation here concerned restored a mode of trial deemed appropriate at common law, with discretionary power in the court to direct separate trials. We do not regard it as harsh or oppressive as applied to the plaintiffs in error."

▇▇ ▇ We do not, however, wish to be understood as saying that our right to make rules of procedure is granted or limited by section 444, Code of Civil Procedure, 1921. Aside from any common law right or statutory grant, the power to make rules of procedure is our constitutional right. Section 1, article VI, of the Constitution of the state of Colorado, provides that the judicial power of the state shall be vested in the courts; section 2

charges this court with "a general superintending control over all inferior courts," and article III of the same Constitution provides that the government shall be divided into three departments, of which the judicial is one, and also provides that neither department shall exercise any powers properly belonging to the other, except as in the Constitution expressly directed or permitted. A search of the Constitution warrants the statement that there is no provision therein expressly directing or permitting the legislative or executive departments to make rules with reference to trial procedure in the judicial department of the government. We are not called upon to determine what right and power the legislative department possesses, with reference to procedure in acquiring jurisdiction of the person or subject matter, but the question with which we are concerned is the right, irrespective of the statutes and the common law, but in conformity with constitutional provisions, to make rules with reference to procedural matters for the conduct of trials. This is inherent in the judicial department. See: 12 C. J. 1103; 6 R. C. L. 294; 1 Cooley's Constitutional Limitations (8th Ed.) 541-554; 23 Illinois Law Review, 276; Journal American Judicature Society, December, 1929; *State v. Superior Court,* 148 Wash. 1, 267 Pac. 770.

The most nearly complete bibliography upon the subject of the rule making power of courts is to be found in 16 American Bar Association Journal, p. 199 et seq. See also: *Walton v. Walton,* 86 Colo. 1, 20; 278 Pac. 780; *Ernst v. Lamb,* 73 Colo. 132, 133, 213 Pac. 994.

The judicial power of the state is vested in the courts; the legislative and executive departments are expressly forbidden the right to exercise it, and the courts, charged with the duty of exercising the judicial power, must necessarily possess the means with which to effectually and expeditiously discharge that duty; this duty can be performed and discharged in no other manner than through rules of procedure, and consequently this court is charged with the power and duty of formulating,

promulgating, and enforcing such rules of procedure for the trial of actions as it deems necessary and proper for performing its constitutional functions. In our scheme of government, the responsibilities thereof are presumably equally divided, and each department must perform its own tasks, and accept the responsibilities therefor. If we assume that for many years the courts have surrendered, to a certain extent, the rule making power to the legislative department, and if we assume that such a practice, over a long period of time, gave validity to the exercise of that function by the legislative department, or that the legislative statutes upon the questions of procedure, and the enforcement of those statutes by the courts, amounted to an adoption thereof by the courts of such statutes as rules of court, all has now been set at rest by the solemn act of the legislature in passing a statute recognizing the constitutional power of the courts to make its own rules for its own procedure.

 This rule is merely a pronouncement of the existing law—in nowise interfering with any constitutional right of a defendant—and, if properly used, will have the salutary effect of assisting in the just determination of cases.

It may be said that juries are very susceptible to, and influenced by, remarks and comments of a trial judge. This is not complimentary to men who are under oath and instructions to find according to the law and the evidence, but, assuming the premise, this cannot be urged in the instant case, because there were two defendants on trial, and the force of the trial judge's comments was directed equally towards both, yet the jury found one guilty, and failed to agree as to the guilt of the other.

For good cause appearing, it is further ordered that the period of defendant's incarceration under his said sentence begin to run from January 1, 1931.

Judgment affirmed.

Mr. Justice Butler and Mr. Justice Hilliard dissent.

Mr. Justice Butler, dissenting.

From the affirmance of the judgment, and from the holding that there was no error in the court's oral comments to the jury on the evidence at the conclusion of the arguments to the jury, I am compelled to dissent.

At the trial the two Morrisons admitted their guilt, and by their own sworn testimony proved it beyond any reasonable doubt. After the court gave its written instructions to the jury and counsel had made their arguments, the court orally instructed the jury as set forth in the majority opinion. In the circumstances, that was equivalent to a statement that, in the opinion of the judge, the defendant was guilty, though leaving to the jury the final determination of the question of the defendant's guilt. The defendant's counsel excepted to the giving of the instruction.

In 1913 the Legislature passed an act, being section 444 of our Code of Civil Procedure, conferring upon this court the power to prescribe rules of practice and procedure in all courts of record. In the exercise of the power thus conferred, we adopted rule 14b, effective September 1, 1929, which provides that, ''The rules governing comments by district judges on evidence shall be those now in force in the United States district courts.'' Sections 6516 and 7099, C. L., quoted in the majority opinion, must be read in connection with section 28 of the Practice Act of 1861, p. 282, Session Laws of 1861, being section 28, p. 510, R. S. of 1868, now section 7105, C. L., reading: ''The district court, in all cases, both civil and criminal, shall only instruct the petit jury as to the law of the case;'' and our decisions denying that the judge of the district court has power to express his opinion on the weight of the evidence, and even condemning questions asked by the court of a witness that ''tended to induce in the minds of the jury a belief that, in the court's opinion, defendant was guilty.'' *Sopris v. Truax,* 1 Colo. 89; *Fincher v. People,* 26 Colo. 169, 175, 56 Pac.

902; *Ryan v. People,* 50 Colo. 99, 105, 114 Pac. 306; *Laycock v. People,* 66 Colo. 441, 182 Pac. 880.

For the purpose of this case, the source of our power to make rules is not important. We now have the power, however we got it. The only question for consideration is whether the district judge properly exercised the power we conferred upon him by rule 14b.

What is the practice adopted by that rule? It is the practice, permissible but in many cases not followed, for the federal district judge, in his instructions to the jury, not only to instruct on the law, but to sum up the evidence so as to refresh the recollection of the jury with reference thereto; take up the facts and circumstances in the evidence and explain their bearing on the controverted points; call the jury's attention to the parts of the evidence that he thinks important, and to the relation of the various items of evidence to each other, and to the strength of the testimony of some witnesses, and the weakness of the testimony of others; and express his opinion as to the weight of the evidence, being careful, however, to caution the jury that such opinion is not binding on the jury. To do this properly requires industry and exceptional ability. When both are present, the practice is a valuable aid to the administration of justice; when either is absent, it is an obstruction rather than an aid. The instructions on the law, the summing up of the evidence, the comments thereon, and the expression of the judge's opinion as to the weight of the evidence, all taken together, constitute the court's instruction, or charge, to the jury.

The practice just described is the practice with which federal practitioners are familiar; the practice that the bar supposed was adopted, and that in fact was adopted, by rule 14b. It was not supposed that, instead of summing up the evidence and commenting thereon, as part of his instructions to the jury, a judge would orally say to the jury at the close of the arguments, "Gentlemen, I am of the opinion that the defendant is guilty, but my opin-

ion is not binding upon you.'' In substance, that was the instruction given by the trial judge in this case.

In the majority opinion it is said, in effect, that comments on the evidence are not instructions and form no part of the instructions, and, therefore, need not conform to the requirements concerning instructions; and a definition is quoted from the opinion in *Wickham v. People,* 41 Colo. 345, 93 Pac. 478. Every opinion must be considered in connection with the facts. In the Wickham case the court orally withdrew from the jury's consideration testimony relating to the reputation of the deceased, which testimony had been received upon the supposition that it would be rendered material and competent by testimony that was to be, but in fact was not, offered later in the trial. It was held that such withdrawal of evidence was not an instruction, and therefore need not be in writing. It was, of course, merely a ruling on the admissibility of evidence. In the opinion we defined an instruction on the law, the only kind of instruction at that time permitted in this state. The decision and the definition have no application to the present case.

At common law the judge instructs, or charges the jury on the law *and* on the facts. This is attested by the quotations in the majority opinion. In the Code of Criminal Procedure drafted by a committee of the National Crime Commission the common law practice is adopted. It says: ''In the conduct of the trial, * * * the judge shall have the same powers as at common law. He shall instruct the jury as to the law applicable to the case, and *in said instructions* may make such comments on the evidence * * * as, in his opinion, the interests of justice may require.'' Willoughby, Judicial Administration, 458. That practice was known to and recognized by our legislature when, in 1861, in the Practice Act, supra, it permitted instructions on the law *only,* thereby forbidding instructions on the facts. In *Sopris v. Truax,* 1 Colo. 89, decided seven years after the enactment of that prohibitory section, we said that by that section ''courts

are confined to the law of the case when instructing juries.'' By our rule we removed that limitation, so that now district judges may instruct on both the law and the facts. The summing up of the evidence and the comments thereon are parts of the instructions, and should conform to the requirements of the law relating thereto. According to our practice in criminal cases, the instructions are in writing; they must be given before the arguments of counsel (C. L. §7104); they must be submitted to counsel so as to afford counsel ''a reasonable time and opportunity to examine [them] * * * and to prepare and present specific objections thereto before such instructions are given to the jury'' (Supreme Court rule 7); they may be commented on by counsel in their arguments to the jury (C. L. §7104); and they ''may be taken by the jury in their retirement'' (C. L. §7105). In the present case not one of these requirements was observed. There are no such requirements in the federal practice. Rule 14b permits our district judges to make comments of such nature and character as federal district judges are permitted to make. In all other respects, our statutes and our rule relating to instructions remain in full force and effect.

In order to make the practice adopted by the rule fit into our system, there should have been several important changes in the statutes and our rules. If the bar had been made aware of our purpose to adopt the rule (which course was urged by me), suggestions might have been made that would have obviated the difficulty. True, the question of the merits of the federal practice had been discussed in a general way, and a few favored the practice; but that is far different from discussing the desirability of incorporating that practice into our system, and the steps necessary to accomplish that result so as to make the new harmonize with the existing practice.

In adopting rule 14b, it seems that we grafted a part of the federal practice upon a practice to which it is ill-adapted; or, to change the figure, we inserted a square

peg into a round hole without making the necessary adjustments. The federal practice and our state practice are so different as to make difficult the application of our rule. We adopted only a small part of the federal trial practice, and we now are confronted with the difficult task of combining these inharmonious elements into a union as nearly satisfactory as the circumstances will permit.*

It seems to me that in giving the instruction in the manner and at the time it was given the court committed an error, and that the error was prejudicial to the rights of the defendant. In *Fincher v. People*, 26 Colo. 169, 175, 56 Pac. 902, we called attention to the fact that, as a general rule, juries readily adopt the view or opinion of the judge upon any matter before them, ''because of his admitted superior qualifications to deal with legal questions, or an inclination upon their part to shirk their responsibility by adopting such views.'' And in *Holland v. People*, 30 Colo. 94, 100, 69 Pac. 519, we said: ''From the position of a judge he may, by his actions, unconsciously exert an influence upon a jury so as to materially prejudice the rights and interests of one or the other of the litigants. By words or conduct, he may unintentionally inject into the jury box his own views regarding the merits of a cause. Jurors, either from an estimation of the abilities of a judge to determine the merits of a controversy, or as a means of escaping the responsibilities which they must discharge, are, no doubt, easily influenced by the views which a judge may entertain with respect to the case on trial.'' In the present case the evidence detailed in the majority opinion—indeed, all of the incriminating evidence introduced by the prosecution—was flatly contradicted by evidence introduced by the defense; and the judge's supplemental oral instruction bluntly expressing his opinion, in effect, that the defendant was guilty, detached, as it was, from the other instructions, and given orally and at a time not permitted by our practice, gave it undue prominence and excessive

emphasis, and was calculated to make a profound impression on the jury. The fact that some of the jurors did not adopt the judge's opinion as to the guilt of Roy Kolkman (John's son), is no indication that they did not give great, even controlling, weight to his opinion as to the guilt of John. Indeed, those who voted to convict Roy may have been influenced, even induced to do so by the judge's expression of his opinion that Roy was guilty.

In 1930 the Circuit Court of Appeals for this circuit decided the case of *Leslie v. United States,* 43 Fed. (2d) 288. There, as here, the facts were in dispute. The instructions to the jury contained this language: "It seems to me, gentlemen, that this defendant is guilty of this crime; it seems to me that he has put up a defense here that will not hold water under this evidence." The court also instructed the jury that the court's opinion was not binding, and the jury might "absolutely disregard it." The instruction, in effect, is not different from the one given at the Kolkman trial, but it was less conspicuous and emphatic because it was not detached from the other instructions and given separately. For the giving of the instruction the judgment was reversed. In the opinion the court said: "It was well said in Weare v. United States, supra, that: 'The jury can easily be misled by the court. Its members are sensitive to the opinion of the court, and it is not a fair jury trial when the court turns from legitimate instructions as to the law to argue the facts in favor of the prosecution. The government provides an officer to argue the case to the jury. That is not a part of the court's duty. He is not precluded, of course, from expressing his opinion of the facts, but he is precluded from giving a one-sided charge in the nature of an argument.' We are of the opinion that the charge in this case falls within the foregoing criticism, and was not cured by the later advice to the jury." Circuit Judges Lewis and McDermott, in their concurring opinion, said of the instruction: "That is going too far."

A few words as to *Horning v. District of Columbia,*

254 U. S. 135. In the majority opinion it is said that in that case "there was little, if any, dispute as to the facts." There was less than "little"; there was none at all. I quote from the opinion of Mr. Justice Holmes: "This was not a case of the judge's expressing an opinion upon the evidence, as he would have had a right to do. *Graham v. United States,* 231 U. S. 474, 480. *The facts were not in dispute,* and what he did was to say so and to lay down the law applicable to them. In such a case obviously the function of the jury, if they do their duty, is little more than formal. The judge cannot direct a verdict it is true, and the jury has the power to bring in a verdict in the teeth of both law and facts. But the judge always has the right and duty to tell them what the law is upon this or that state of facts that may be found, and he can do the same none the less when the facts are agreed. If the facts are agreed the judge may state that fact also, and when there is no dispute he may say so although there has been no formal agreement. Perhaps there was a regrettable peremptoriness of tone—but the jury were allowed the technical right, if it can be called so, to decide against the law and the facts—and that is all there was left for them after the defendant and his witnesses took the stand. If the defendant suffered any wrong it was purely formal since, as we have said, *on the facts admitted there was no doubt of his guilt.* Act of February 26, 1919, c. 48, 40 Stat. 1181." The statute referred to directs courts to disregard technical errors that do not affect the substantial rights of the parties. The situation here is entirely different from that in the Horning case, for in the present case the evidence was in direct conflict. If that had been the situation in the Horning case, it is clear, from both opinions in that case, that the judgment would have been reversed because of the trial judge's statement to the jury. As it was, four justices, including the chief justice, dissented. In the dissenting opinion it was said: "It is said that if the defendant suffered any wrong it was purely formal; and

that the error is of such a character as not to afford, since the Act of February 26, 1919, c. 48, 40 Stat. 1181, a basis for reversing the judgment of the lower court. Whether a defendant is found guilty by a jury or is declared to be so by a judge is not, under the Federal Constitution, a mere formality.''

The defendant, John Kolkman, did not have the fair trial to which he was entitled. The course pursued by the trial judge was not in accordance with the common law practice, the federal practice or the state practice.

Entertaining the foregoing views, I am unable to join the majority of my brethren in placing upon the course pursued by the trial judge the stamp of approval. The judgment, in my opinion, should be reversed.

The foregoing was written several weeks ago. Since that time the majority opinion has been amended so as to cover the question of the constitutionality of the rule and the source of this court's power to make rules of practice and procedure. The language on that subject in the majority opinion assumes added importance from the fact that the Legislature has just passed an act, approved April 14, 1931, amending section 444 of the Code of Civil Procedure by adding: ''Provided, that no rule shall be made by the Supreme Court permitting or allowing trial judges of courts of record to comment on the evidence given on the trial.''

Whether the power to make such rule was by virtue of the act of 1913, or was inherent in the court, we had it; that is sufficient for the purpose of a decision in this case. It seems to me that the discussion in the opinion is not necessary to a decision, that it has no proper place in the opinion, and that it is mere dictum. However, the doctrine announced in that dictum is so far-reaching, so revolutionary (if I may use the expression), that it should not be permitted to go unchallenged. The language used indicates that this court claims to possess the exclusive power to prescribe rules governing procedure in trial courts. In effect, it gives this warning to the Legisla-

ture: Hands off! There must be no more codes of civil procedure, or amendments thereof; no more legislative acts concerning procedure in either civil or criminal cases. Such interference will not be tolerated by this court.⁄

Let us see what warrant there is for the court's assumption of exclusive power to make rules regulating practice and procedure in trial courts. In the absence of legislation, a supreme court, of necessity, may regulate procedure in that court. In 1792 Congress had passed no act concerning procedure in the Supreme Court. For that reason the court, in Hayburn's case, 2 Dallas 409, exercised the power. In 1789 the Judiciary Act, passed by Congress, conferred upon the Supreme Court the power to make rules of procedure in suits in equity and admiralty in circuit and district courts, "not inconsistent with the laws of the United States." R. S. 1875, sec. 913. Equity rules were adopted by virtue of the power so granted, not in the exercise of any inherent power residing in the court. In 1842 a similar act was passed. R. S. 1875, sec. 917. In *Los Angeles Brush Mfg. Corporation v. James,* 272 U. S. 701, decided in 1926, the court, speaking through Chief Justice Taft, said: "By §917 of the Revised Statutes, this court is *given power* from time to time, in any manner not inconsistent with the laws of the United States, to regulate the whole practice to be used in suits in equity or admiralty by the district courts— *Wayman v. Southard,* 10 Wheat. 1. This was taken from §13 of the original Judiciary Act, 1 Stat. 80, c. 20." Section 17 of the Judiciary Act of 1789 provided: "That all the said courts shall have power * * * to make and establish all necessary rules for the orderly conducting business *in the said courts,* provided such rules are not repugnant to the laws of the United States." In *Wayman v. Southard,* 10 Wheat. 1, Chief Justice Marshall said, with reference to that section: "The 17th section of the Judiciary Act, and the 7th section of the additional act, *empower* the courts respectively to regulate their

practice. It certainly will not be contended that this might not be done by congress. The courts, for example, may make rules directing the returning of writs and processes, the filing of declarations and other pleadings, and other things of the same description. It will not be contended that these things might not be done by the legislature, without the intervention of the courts; yet it is not alleged that the power may not be conferred on the judicial department." In *Bank of the United States v. Halstead,* 10 Wheat. 51, 61, the court said: "Congress might regulate the whole practice of the courts, if it was deemed expedient so to do: but this power is vested [by act of Congress] in the courts."

Beginning with the year 1789 and continuing to the present day—for 142 years—Congress has passed acts regulating practice and procedure in both civil and criminal cases, and such acts have uniformly been enforced as binding upon the courts as well as upon the litigants.

Congress passed an act conferring upon the Court of Appeals of the District of Columbia the power to "make such rules and regulations as may be necessary and proper for the transaction of the business to be brought before it." In the case of *In re Hien,* 166 U. S. 432, 436, the Supreme Court said that, "The general rule undoubtedly is that courts of justice possess the inherent power to make and frame reasonable rules not conflicting with express statute"; but held that the statute "authorized" the court to adopt the rule involved in the suit. The court had reference to rules of procedure before the court making them, not before some other court.

In 1789 Congress passed an act conforming the practice in federal trial courts to the practice in the state courts. Similar statutes have been enacted from time to time. The Supreme Court holds that such acts are within the constitutional powers of Congress. Thus, in *Indianapolis, etc., Railroad Co. v. Horst,* 93 U. S. 291, in which the Conformity Act was considered, the court said: "Where a State law, in force when the act was passed,

has abolished the different forms of action, and the forms of pleading appropriate to them, and has substituted a simple petition or complaint setting forth the facts, and prescribed the subsequent proceedings of pleading or practice to raise the issues of law or fact in the case, such law is undoubtedly obligatory upon the courts of the United States in that locality." See 25 C. J., p. 797, et seq.

In *Horning v. District of Columbia*, 254 U. S. 135, cited supra and in the majority opinion herein, the court recognized the binding force of the act of Congress directing courts to disregard technical errors that do not affect the substantial rights of the parties.

For many years the American Bar Association has appealed to Congress, as the source of power, to enact the Association's bill reading as follows: "That the Supreme Court of the United States shall have the power to prescribe, by general rules, for the district courts of the United States and for the courts of the District of Columbia, the forms of process, writs, pleadings, and motions, and the practice and procedure in actions at law." A. B. A. Rep., 1929, p. 515. In his message to Congress in 1910, President Taft said: "I am strongly convinced that the best method of improving judicial procedure at law is to empower the Supreme Court to do it through the medium of the rules of the court, as in equity." A. B. A. Rep. 1926, p. 519. Speaking before the American Bar Association in 1922, Chief Justice Taft said: "Congress from the beginning of the government has committed to the Supreme Court the duty and power to make the rules in equity, the rules in admiralty, and the rules in bankruptcy. Moreover, this American Bar Association has for some years been pressing upon Congress the delegation of power to the Supreme Court to regulate by rule the procedure in suits at law." A. B. A. Rep. 250, 260.

The state bar associations throughout the country adopted resolutions urging Congress to pass an act "authorizing" the Supreme Court to prescribe rules

regulating practice and procedure in law actions in the district courts. The Colorado Bar Association adopted such a resolution unanimously. C. B. A. Rep. 1913, p. 115.

What is true of the federal practice is true of the state practice. From the beginning legislatures have passed practice acts and codes of procedure, and prior to this decision no court has questioned the power of the legislature to do so. Though many judges accustomed to the common law practice were opposed to the Code of Civil Procedure, none denied the power of the legislature to enact it.

At its first session, held in 1861, the territorial Legislature of Colorado passed a practice act. After Colorado became a state the Legislature, at its first session, held in 1877, enacted the Code of Civil Procedure. With reference to the present Code, this court said, in *Walton v. Walton,* 86 Colo. 1, 35: "No doubt of the validity of that code is entertained"; thus recognizing the constitutional power of the Legislature to enact laws regulating practice and procedure. The act of 1913 is section 444 of the Code. Our reports are full of cases recognizing that such acts are within the power of the Legislature and obligatory upon the courts. Three only will be cited. *Sopris v. Truax,* 1 Colo. 89; *Baker v. Barton,* 20 Colo. 506, 39 Pac. 65; *Cary v. Mine and Smelter Supply Co.,* 53 Colo. 556, 129 Pac. 230.

The power to make rules of practice in this court, "not inconsistent with the constitution or laws of this state," was conferred upon the court by section 5630, C. L., and we made rules pursuant to the power thus conferred. The court now claims the exclusive power to prescribe rules governing practice and procedure in other courts. "In the absence of some authority under either the constitution or a statute, an appellate court has no power to make rules which are binding on an inferior court as to practice and proceedings in the latter." 15 C. J., p. 904.

It is claimed that the power is conferred by article III

of the Constitution, partitioning the powers of government among three departments, and section 1 of article VI, vesting judicial power, ''except as in the Constitution otherwise provided,'' in the courts. Logically, the argument is this: The power to regulate procedure belongs exclusively to the judiciary: therefore, to the Supreme Court exclusively belongs the power to regulate procedure, not only in that court, but also in all the other courts. The fallacy is apparent. There is an assumption that the Supreme Court alone *is* the judiciary—an assumption strikingly similar to that of a certain French king concerning his relation to the state. By virtue of section 1 of article VI, the judiciary consists of the Supreme Court, the district courts, the county courts, and such other courts as may be provided by law. Assuming what we have seen is not the case, that the rule-making power belongs exclusively to the courts, it belongs to all the courts, not to the Supreme Court alone; each court having power to make rules governing procedure in that court, not in some other. If this court has that broader power, it must be by reason of an express provision, or as an incident to its superintending control over the other courts. There is no such express provision, other than the act of 1913, as amended in 1931; and superintending control over inferior courts is made subject to regulation and limitation by the lawmaking department. Section 2, article VI, is as follows: ''The supreme court * * * shall have a general superintending control over all inferior courts, *under such regulations and limitations as may be prescribed by law.*'' The Constitution shows an intention to permit the Legislature to regulate procedure, the only limitation placed upon that power being found in section 25, article V, of the Constitution, reading: ''The general assembly shall not pass local or special laws * * * regulating the practice in courts of justice''; and in section 28, article VI, which provides: ''All laws relating to courts shall be general and of uniform operation throughout the state; and the * * * proceedings

and practices of all the courts of the same class or grade, so far as regulated by law, * * * shall be uniform.''

The act of 1913 was sponsored by the Colorado Bar Association. It was drawn by its committee ''with special reference'' to section 2, article VI, supra. C. B. A. Rep. 1913, p. 325. In *Ernst v. Lamb,* 73 Colo. 132, 213 Pac. 994, we held that that act *gave this court power* to prescribe rules of practice and procedure, that it was not a delegation of legislative power, and that it is constitutional. We said that the rule there involved ''was promulgated by this court under the authority of the act of March 3, 1913.'' Similar bills were sponsored by the bar associations of other states. In other words, the state bar associations of this and other states appealed to the legislative department, as the source of power, to confer upon the several supreme courts the power to prescribe rules of practice and procedure in inferior courts.

We now are called upon to believe that from the dates of their creation to this day the highest court of the nation and the highest state courts, including this court, through ignorance, timidity or apathy, have permitted the legislative department to usurp the power of the judiciary; that the American Bar Association and the bar associations of this and other states were all wrong in appealing to the legislative department as the source of power; that the Colorado act of 1913 was not passed to confer any rule-making power upon this court, but because the Legislature had come to a realization of its misconduct in passing the Practice Act of 1861, the Code of Civil Procedure and the acts prescribing the practice and procedure in criminal cases, and, repenting of its usurpation, passed the act in order to restore the stolen power to the court. /

Of the 27,300 members of the American Bar Association (A. B. A. Rep. 1929, p. 1408), several have expressed views similar to those found in the majority opinion; but one of them—one of the ablest—after expressing his views, concludes: ''It may be that today, after seventy-

five years of codes and practice acts and prolific procedural legislation, we can't go so far as to pronounce such legislative interference with the operations of a coordinate department to be unconstitutional. Perhaps the ground is so far debatable that the courts could not have resisted legislative annexation of that domain. Today, possibly, we must concede that the legislature may enact codes of procedure and detailed practice acts." 12 A. B. A. Jour. (Sept., 1926) p. 601.

Most of the authorities cited in the majority opinion on this branch of the case sustain the position taken in this dissenting opinion. Thus, 12 C. J., p. 1103, recognizes the validity of statutes concerning procedure, provided they do not deprive the accused of any substantial protection. And 6 R. C. L. 294 is to the same effect. It says: "Statutes making changes in the remedy or procedure are always within the discretion of the law-making power." And Cooley's Constitutional Limitations (8th Ed.) 551-52 is to the same effect. It says, at page 552: "The legislature may * * * prescribe altogether different modes of procedure in its discretion, though it cannot lawfully, we think, in so doing, dispense with any of those substantial protections with which the existing law surrounds the person accused of crime." In *State v. Superior Court,* 148 Wash. 1, 267 Pac. 770, cited in the majority opinion, there was involved a legislative act "authorizing" the Supreme Court to make rules relating to practice and procedure in the courts of the state. The court suggested the question whether the rule-making power was not purely a judicial function, and referred to Hayburn's case, 2 Dallas 409, where the Supreme Court of the United States, in the absence of legislation, as already noted, adopted the practice of the English courts of King's Bench and Chancery for the practice in the Supreme Court—not, it will be observed, for the practice in the inferior federal courts. The Washington court concluded, however, that "the point here in controversy can be decided upon a far more stable foundation,"

and held that the act was constitutional; that the Legislature may delegate power to the Supreme Court to make rules for other courts. The article in the December, 1929, number of Journal of American Judicature Society, also cited in the majority opinion, discusses the Washington case, supra, and says: "As to the safety of permitting the Supreme Court to regulate criminal procedure the doubters should recall the fact that in nearly all states the rule-making power is conferred, as in Washington, by a legislature which can repeal its act at any time and reassume its accustomed authority."

In the majority opinion there is a quotation from the opinion in *Chatfield v. Ohio,* 269 U. S. 167, which clearly recognizes that the legislative department has the power to pass acts regulating procedure. Speaking of the provision of the Constitution forbidding states to pass ex post facto laws, the court said that that provision was not intended "to limit the legislative control of remedies and modes of procedure which do not affect matters of substance."

In the majority opinion, this court not only recognizes, but insists upon, the binding effect of section 145, page 321, of the statutes of 1861, now section 7099, C. L., adopting the common law trial procedure and rules of evidence, "except when this chapter points out a different mode"; and section 6516, C. L., adopting the common law of England, "so far as the same is applicable." The court says that as "neither of the two last mentioned sections has been repealed, * * * we must determine the common law procedure," etc. In other words, the Legislature having prescribed the procedure, the courts are bound by its action.

So it seems that the court's pretension to exclusive power to make rules regulating practice and procedure in other courts has no constitutional warrant. I respectfully submit that the court does not possess the exclusive rule-making power claimed by it, unless, indeed, we assume that some super-power resides in the court, and in-

voke some principle akin to the doctrine, long since discredited and abandoned, that the king rules by divine right.

Two specially concurring opinions have just been handed to me. The one written by my brother Burke contains strong confirmation of the view, expressed in this dissenting opinion, that the court does not have exclusive power to regulate the procedure in the trial courts. I join in the praise bestowed upon the work of the American Law Institute, performed at the request of organizations of the very highest standing. The institute prepared a model Code of Criminal Procedure for submission to the state legislatures throughout the United States. It covers the entire procedure from arrest to and including appeal and the execution of the sentence. It contains a provision conferring upon trial courts the power, in giving its instructions to the jury, to comment upon the evidence. In the introduction the institute offers to cooperate with the bar in preparing, "for presentation to the legislature," bills "embodying the provisions of the Code." This is a clear recognition of the power of the legislative department to regulate procedure in the courts, and an emphatic repudiation of the claim that that power belongs exclusively to the judiciary.

The contention that section 7099, C. L., adopts the common law method of trial in criminal cases impliedly confesses that the Legislature has such power. That section adopts the common law trial procedure, "except when this chapter points out a different mode." That section is in chapter 153 of the Compiled Laws; and that very chapter (sec. 7105) points out a different mode concerning instructions; namely, that the district court shall instruct the jury on the law only.

A comparison of the federal and state constitutions does not aid the position assumed in the majority opinion and in my brother Burke's concurring opinion. The federal Constitution vests the judicial power of the United

States, without any reservation or exception, in the Supreme Court and the inferior courts. If, as claimed in the majority opinion, the power to regulate court procedure is inherently and exclusively a judicial power, the federal courts—not the Supreme Court alone—possesses that exclusive power; yet we have seen that Congress is vested with, and always has exercised, the power, which negatives the exclusive possession thereof by the courts. The provisions of article III of the Colorado Constitution express no more than the rule enforced by both federal and state courts; namely, that one department of government shall not usurp the powers properly belonging to another. There are these differences between the federal Constitution and the state Constitution: The former vests the judicial power in the courts without any reservation or exception, whereas the latter vests the power in the courts, "except as in the Constitution otherwise provided" (Art. VI, §§1 and 2) ; and by section 2 of article VI, this court's "superintending control" over inferior courts is made subject to "such regulations and limitations as may be prescribed by law"; and section 25 of article V and section 28 of article VI recognize the legislative power to regulate practice and procedure in the courts.

Mr. Justice Hilliard, dissenting.

I concur in the views expressed in the opinion of my brother Butler, but since I believe there are additional reasons why the judgment should be reversed I propose to set them out at some length.

I am in accord with the statement of the rule concerning conspiracy and the admission of testimony showing statements made by one of the conspirators in furtherance of the common design. Such seems to be settled by the decisions of this court. *Davis v. People,* 22 Colo. 1, 43 Pac. 122; *Johnson v. People,* 33 Colo. 224, 80 Pac. 133. But as I view the record considerable of the testimony admitted is without the protection of this doctrine. The

true rule seems to be that statements made during the existence of the conspiracy by any of the conspirators are admissible whether made in the presence of the conspirator against whom they are sought to be used or not, provided such statements are in furtherance of the common design. *State v. Walker,* 124 Iowa 414, 100 N. W. 354.

I do not see, therefore, how it can be said that certain of the testimony of the witness J. B. Morrison was proper. For example, this witness testified that in December, 1929, after he had been all over the Southwest for some time, at the expense, so he said, of the defendants Kolkman, he came back to Colorado and was arrested. Out of the presence of the defendant John Kolkman he said that Roy Kolkman had told him that "* * * by the time the Court sets in the fall they would have it thrown out of Court and there would be no trial * * *. Roy told me him and John had fixed everything if I would sign some papers and there would be nothing to it. Never did see the papers. I told them I figured the District Attorney was the only man who could release me. Roy said the Judge was gone and they couldn't fix the papers on that account, but that they could bring them to me in Oklahoma. I then went back to Oklahoma and got back here about the last of February [1930]. Talked to Roy the night I got in. Roy said he had everything fixed and I could refuse to testify on the ground that the evidence I gave might incriminate me; that the Court could not force me to testify; that they would do the same thing and Burson would not identify these hogs and the case would be thrown out of court * * *."

This testimony was given in response to three questions, each of which was objected to and exception saved. I believe it error to have overruled them. It requires a great stretch of one's imagination to conclude that these statements were in furtherance of the conspiracy. They are merely narrative; they amount only to a recitation of remarks made at a meeting between the witness and

Roy Kolkman when the subject under discussion was not how to devise ways and means of escape, to conceal the crime, or do anything aimed to perfect the common design. Nothing was planned; nothing agreed upon; no act contemplated; no act done. It was merely said that under the law Morrison could refuse to testify; the Kolkmans could do likewise; Burson would not identify the hogs; and that the District Attorney would have no case to prosecute. How any of these statements furthered the common design or can be thought to have any effect on it I do not perceive.

Perhaps the testimony was immaterial in any event, but that it could have had an unfavorable effect upon the jury is conceivable. Besides, as I think it was very well said in *State v. Walker, supra,* ''The defendant was entitled to the verdict of the jury as to his guilt, free from any prejudice that might reasonably arise from the submission to them of this improper evidence. 'Without the illegal testimony the jury may not have found the verdict for the State; this testimony may have made the complement of proof which satisfied their minds. In that case the defendant would have been convicted upon illegal evidence. This court cannot determine what quantity of evidence was lawfully sufficient to authorize the verdict.' *State v. Westfall,* 49 Iowa 328.''

Simply because two or more men have been charged jointly with the commission of a crime does not make every word they may utter between the day of the alleged offense and the commencement of their trial admissible. To hold that that is the law, which is the effect of the decision of the court here, is to emasculate the statute giving the right to separate trials; more, it repeals it.

There are at least three reasons, as I understand the law, why our rule 14b should be held to be inoperative. It is, as to the case at bar, ex post facto, for the alleged crime was committed February 4, 1929, while the rule did not become in force until September 1, 1929. *Garvey v. People,* 6 Colo. 559, and *Kring v. Missouri,* 107 U. S.

221, sustain this proposition and I cannot perceive the difference between them and this cause that the court seems to believe exists. The principles enunciated in the Garvey case and the Kring case are of universal application, and distinctions based upon differing sets of facts do not disturb them. The question is, has some alteration been made in the law that works to the substantial disadvantage of the defendant? In the Kring case the Supreme Court of the United States uses this language: "When * * * we are told that this very radical change in the law of Missouri to his disadvantage is not subject to the rule because it is a change, not in crimes, but in criminal procedure, we are led to inquire what that [Missouri] court meant by criminal procedure."

After considering the authorities upon what is meant by "criminal procedure" the court concludes that by it is meant pleading, evidence and practice. The court then says: "Can the law with regard to bail, to indictments, to grand juries, to the trial jury, all be changed to the disadvantage of the prisoner by State legislation, after the offense committed, and such legislation not held to be ex post facto, because it relates to procedure, as it does according to Mr. Bishop? And can any substantial right which the law gave the defendant at the time to which his guilt relates be taken away from him by ex post facto legislation, because, in the use of a modern phrase, it is called a law of procedure? We think it cannot."

Can the right of the defendant here to be tried by jury without "comment" from the trial judge be taken away from him by a rule adopted after the commission of the charged crime and especially by a rule which, so the court has here held, permits the trial judge to declare him to be guilty? I think it should not. A law is ex post facto if it alters the situation of a person to his disadvantage. Will anyone say that this rule, permitting the trial judge to express opinion that the defendant was guilty, did not alter the situation of the defendant to his disadvantage? I think not.

If there be aught in *Beazell v. Ohio,* 269 U. S. 167, that overrules the Kring case, I do not find it either from the excerpt quoted by the court here or from a reading of the whole case. But if the Kring case is overruled by it I can only regret the relaxation of constitutional guaranties in the interest of expediency or other motives which should never control the minds of judges or the workings of courts.

Next, the rule is unconstitutional for another reason. Remember, it is a rule adopted in pursuance of power thought to be granted this court by chapter 121, S. L. 1913. True, the court has determined that the power to make the rule is perhaps existent without the statute, but for present purposes I shall assume that our right in the premises arose out of that statute. So, assuming it must be admitted that while not a statute in the ordinary meaning of that word, it is a statute in the sense that it is law created other than through the rule of decision. The legislature is forbidden by article 5, section 24, of the Constitution to revive or amend a law "by reference to its title only, but so much thereof as is revived, amended, extended or conferred, shall be reenacted and published at length." *People v. Friederich,* 67 Colo. 69, 185 Pac. 657. Our sole power, in my opinion, to make such rules, if we have it at all, and of that I am gravely doubtful, is to be found in the legislative grant to that end. Are we greater than our creator; can we by virtue of this grant exercise powers and make laws forbidden to be exercised or made by the legislature? I think not. How, then, may we lawfully—constitutionally—adopt the nebulous uncertainty, "The rules governing comments by district judges * * * in the United States courts." I respectfully say that all the authorities cited in the opinion of the court and intended to show what the "rule" is in the federal courts show instead that there is no rule. It seems to me we could have with much more grace declared this rule to be void than to defend it as we have. If the rule is a proper one we could then, in light of what

experience has taught us, have redrafted it in certain terms, and made plain what is now and must, I submit, remain indefinite and a source of misunderstanding, doubt and recrimination. I am not insensible, in this connection, that the court has said that "It seems passing strange that no one empowered under this rule has indicated any doubt as to the meaning thereof, or the extent of his power and duty thereunder," and that "* * * we intended [by the rule] to advise the profession that, in this respect, they might thereafter expect trials to be conducted in the state courts the same as they were conducted in the United States district courts. If we have failed in this purpose, it is because the imperfections of the English language preclude a more definite, certain, and comprehensive statement of the rule, and until some one more adept in its use submits a rule more clearly expressing and defining the intention of those who promulgated it, we must ask the profession to accept and use it in its present form." I presume that by the first quotation the court means that no district judge has indicated any doubt of his power and duty under the rule, but that that is so is for a very obvious reason. The question of its meaning has not been hitherto before us and since we are apprised in no other way of the business and conduct of trial courts it would be passing strange indeed if we had any information on the attitude of the district judges whatever.

I presume that by the second quotation the court means that the rule cannot be stated with greater certainty, and lay the blame at the door of the language in which our thoughts must be expressed. I cannot for a moment subscribe to such an announcement. To say that the highest tribunal of a sovereign state is so circumscribed is to say that we are incapable of stating any proposition of law in certain terms. It is no answer that section 6516, C. L. 1921, in conferring the common law upon us uses scarcely more words than are in rule 14b. The common law as it existed prior to the fourth year of

King James I was the growth of centuries of decisions and statutes touching upon every or nearly all of the relations that exist between men. Its marvelous flexibility in meeting the changing needs of man and time has been repeatedly explained and praised, and I concede the difficulty of codifying it. The American Law Institute has found the restatement of the law a hard task. But surely that does not mean that a single proposition of procedure or practice may not with the exercise of diligence and intelligence be reduced to terms more definite, more certain, more capable of understanding, and less productive of doubt than our rule 14b. I would not care to undertake to draft such a rule for the very simple reasons that I do not believe we have the power to adopt it or that such a rule is wise in any event, but I cannot see that my position should require me to do that which I am very confident my brethren are fully capable of doing. If the court believes that a rule of this character is properly to be made, and that it is an advance in procedural methods, surely among us we have the wisdom to set down words that will make our meaning and intention clear.

It is only too obvious, I fear, that the rule is indefinite and uncertain. If it were otherwise it would not require voluminous explanation, definition and interpretation. We have not hesitated to condemn acts of the legislature because they defied reasonable understanding. *In Re House Resolution,* 12 Colo. 359, 21 Pac. 485. We should not hesitate to pass similarly upon our own rules if they be attacked for as good reason.

As I have said, the federal authorities cited in the opinion of the court indicate uncertainty rather than the existence of a rule. Many of these cases, as I read them, would furnish ample reason to reverse the case at bar because of the language employed by the trial judge. *Bogileno v. United States,* 38 Fed. (2d) 584, is one. The only distinction I can perceive between it and this cause is that the language of the trial court there was not as

certainly calculated to result in a verdict of guilty as the language employed by the trial court here.

I am not greatly concerned by the question of terminology which seems to disturb my majority brethren. The word "rules" is capable of many definitions. We speak of "rules of law," "doctrines of law," "principles of law," "theories of law." Often those expressions are of like meaning; they are not necessarily so. We pointed out in *Parker v. Plympton,* 85 Colo. 87, 273 Pac. 1030, that our rules of practice and procedure are often to be found in our decisions and not all of them are gathered up in the little green volume called "Rules of the Supreme Court—1929." But it does appear proper to my mind that when we undertake to make a rule and publish it in that green volume we should couch it in such language that judges and attorneys will have an inkling of our meaning. Our assumption that the profession would understand it was too sanguine, and for my part, subject to what I have said above, I would rather redraft the rule than to endeavor to interpret it.

Assuming, however, as I must, in view of the opinion of the court, that the rule is effective, I cannot agree that it was properly applied here. I do not believe that it was the intent of the rule, and certainly it is not the law in the courts of the United States, that the trial judge may say that the defendant is guilty. The jury is still the trier of the facts and the judge may not usurp that function. As was said in *Bogileno v. United States, supra,* "The purpose he [the defendant] assigned may have impressed the court as unreasonable and even unbelievable, but the court could not pass upon that. It was a question for the jury. The question of his intent was an issue of fact, and not of law, for the jury's determination." The testimony of the Kolkmans may have impressed the trial judge in this case as unworthy of credence, but that did not authorize him, especially in view of his own statement that there was direct conflict between the evidence offered by the Kolkmans and that given by the two Mor-

risons, to say that he believed "that the evidence taken as a whole and all the circumstances as they have been presented here show that all four of these defendants were guilty. *Leslie v. United States,* 43 Fed. (2d) 288, cited in the opinion of the court, was reversed because of the trial judge's statement that "It seems to me, gentlemen, that this defendant is guilty of this crime; it seems to me that he has put up a defense here that will not hold water under this evidence." There is no difference in substance, and hardly in language, between that objectionable comment and the words uttered by the trial judge in the case at bar and above quoted. If our rule is the same as that of the district courts of the United States we might well reverse this judgment upon the authority of the Leslie case alone.

*Starr v. United States,* 153 U. S. 614, may afford some light on the subject. There, at page 625, the court quotes with approval from Commonwealth v. Selfridge, this language: "As to the evidence, I have no intention to guide or interfere with its just and natural operation upon your minds. I hold it the privilege of the jury to ascertain the facts, and that of the court to declare the law, to be distinct and independent. Should I interfere with my opinion, with the testimony in order to influence your minds to incline either way, I should certainly step out of the province of the judge into that of an advocate. All that I can see necessary and proper for me to do in this part of the cause is to call your attention to the points or facts on which the cause may turn, state the prominent testimony in the case which may tend to establish or disprove these points, give you some rules by which you are to weigh the testimony, if a contrariety should have occurred, and leave you to form a decision according to your best judgment, without giving you to understand, if it can be avoided, what my own opinion of the subject is. Where the inquiry is merely into matters of fact, or where the facts and law can be clearly discriminated, I should always wish the jury to leave the stand without

being able to ascertain what the opinion of the court as to those facts may be, that their minds may be left entirely unprejudiced to weigh the testimony and settle the merits of the case.''

Again, at page 626, quoting from a decision of the Supreme Court of Pennsylvania: ''When there is sufficient evidence upon a given point to go to the jury, it is the duty of the judge to submit it calmly and impartially. And if the expression of an opinion upon such evidence becomes a matter of duty under the circumstances of the particular case, great care should be exercised that such expression should be so given as not to mislead, and especially that it should not be one-sided. The evidence, if stated at all, should be stated accurately, as well that which makes in favor of a party as that which makes against him; deductions and theories not warranted by the evidence should be studiously avoided. They can hardly fail to mislead the jury and work injustice.'' *Burke v. Maxwell*, 81 Pa. 139, 153.

In Bouvier's Law Dictionary (Rawles Third Revision), under the subject ''Charge'' it is said (p. 460) : ''Though this is customary in many courts, the judge is not bound to sum up the facts; Thomps. Charging Juries, §79; *State v. Morris*, 10 N. C. 390. But if he do sum up he must present all the material facts; *Parker v. Donaldson*, 6 W. & S. (Pa.) 132; *Merchants' Bank of Macon v. Bank*, 1 Ga. 428. This is the practice in the courts of the United States; *United States Exp. Co. v. Kountze Bros.*, 8 Wall. 342.''

I take it that the practice in the federal courts is that the judge may, but is not required, to sum up the facts. If he does so he must present all that are material. He is not at liberty to discuss isolated problems or draw conclusions unwarranted by all the testimony. He must not invade the province of the jury by stating that the evidence, if in conflict, should be controlling upon one side or the other. It is his duty to advise and assist the jury, not to take its place.

I must, therefore, especially emphasize my disagreement with the doctrine announced by the court that the trial judge may make as little or great a review as he desires. I do not believe it to be the law of the United States courts that "Comments are to be made in the discretion of the trial court" in the sense that the summing up may be restricted to a conclusion that the defendant is guilty. The discretion of the trial court is only whether there shall be a summing up or not. The rule at the common law was to that effect, as the quotation from Blackstone found in the opinion of the court indicates. Blackstone said that "When the evidence is gone through on both sides, the judge, in the presence of the parties, the counsel and all others, *sums up the whole* to the jury."

It does not seem to me that it should be said that it is not complimentary to juries to say that they are susceptible to and influenced by remarks and comments of a trial judge. If so, this court has hitherto been unkind in that behalf. Jurors are laymen, frequently unfamiliar with the law they are called upon to apply. Why they should not give great weight to the remarks and comments of the judge I do not know. It would be contrary to the general course of human nature for them to do otherwise. Besides, if they are not susceptible, and are unlikely to be influenced, our rule 14b will be of very little use and will not accomplish that which it is thought it will. That jurors are susceptible in such situation is the opinion of the Supreme Court of the United States. *Starr v. United States, supra; Hicks v. United States,* 150 U. S. 442.

I desire also to emphasize a point made by Mr. Justice Butler. The opinion of the court is to the effect that the "comments" are not part of the instructions and need not be in writing for that reason. *Wickham v. People,* 41 Colo. 345, 93 Pac. 478, cited to that end, does not seem to support that position. The definition in that case served very well there, because the question was, what is

an instruction within the meaning of sections 7104 and 7105, C. L. 1921. But in this cause we are faced with the problem of what is an instruction in the federal practice. The federal practice is that the court charges or instructs the jury concerning both the law and facts at the same time and that the total of his remarks constitute the charge or instructions. *Starr v. United States, supra,* and cases therein cited. Hence, if we are to graft the federal practice to ours we should hold that the "comments" are part of the instructions, should be reduced to writing, and be given at the same time as the other instructions. That would partially, at least, make the working of rule 14b adaptable to a system which, as Mr. Justice Butler has said, is ill adapted to receive it. The suggestion made in the opinion of the court is that it would be "an unprecedented, novel, confusing and pernicious practice" to require the trial judge to make his comments in writing and deliver them at the same time as the other instructions. It seems to me to be far more unprecedented, novel, confusing and pernicious to allow the trial judge to make the third speech for the prosecution as the trial judge did here.

In the opinion of the court it is said that experience has proven that the practice of permitting the trial judge to comment upon the testimony has resulted in a much more successful administration of justice than heretofore obtained in our courts. No authority is cited for this proposition and I know of none. Statistics could be procured, I presume, upon the number of persons tried, the number convicted, the number acquitted, the number convicted who appealed, and the number of convictions reversed, in the several state and federal courts. But to correlate them would be, I think, impossible. My observation, in many years of practice, is that no more offenders escape in a well conducted Colorado court than escape in a well conducted federal court. My own opinion, contrary to that of my brethren, is that experience has not demonstrated the superiority of the practice of the federal

courts and that ultimate justice may more often lie in the hearts of the jurors than in the mind of the judge.

It is not altogether clear what the court means by the assertion that permitting the trial judge to comment upon the evidence will mean a more successful administration of justice. It is likely, however, that it arises out of a belief that under our present system it has too frequently happened that the required observances of technical formalities has resulted in reversals of cases where the guilt of the defendant was apparently overwhelmingly established and justice, the ultimate object of every litigated matter, had been done. To this I say that it is not the duty of the Supreme Court or of any court to be concerned with the guilt or innocence of a defendant. The duty of the courts is to take care that the defendant is given a fair trial according to law and that he be not deprived of life or liberty without due process of law. And it should be remembered that the technicalities (as we call rules of law that do not suit our passing need) of the criminal law were made for the benefit of innocent men entitled to retain their lives and have their liberty, and it is for them that they are enforced. If occasionally, and I say it is not often, a guilty man escapes his just punishment, that is the price we must pay in order that we may have protection. In Marjoribanks' biography of Sir Edward Marshall Hall, K. C., that eminent barrister is reported to have said that it were far better that ten thousand guilty men escape than that the majesty of the common law be violated. Nor is the cause of civilization, of liberty, of constitutional government, served when an innocent man is convicted because of a precedent created in the process of ensuring punishment to a man whose guilt has been overwhelmingly established.

I question very seriously whether any great number of cases have been reversed where the guilt of the defendant was overwhelmingly established. Indeed, examination of our reports covering the last decade shows that very few cases have been reversed at all, and that

all that were reversed were reversed for very substantial reasons. In none of the cases reversed would the result have been in anywise influenced had the trial judge had the power and taken the opportunity to "comment" upon the testimony. In volumes 67 to 87, inclusive, of our reports, covering the period from 1920 to 1931, 213 criminal cases were reported. Of that number 167 were affirmed and 46 reversed. In other words something less than 22 per cent were reversed, something more than 78 per cent affirmed. A much greater percentage of civil cases was reversed, but I have drawn no conclusion from that. The point I am seeking to make is that reversals are not nearly as common as has been supposed to be the fact. They appear to be growing less common, for in volumes 80 to 87, inclusive, 52 criminal cases were disposed of and but 5 reversed, or less than 10 per cent. In volumes 80, 81 and 85 all criminal cases reported were affirmed, while in volumes 82, 83, 84, 86 and 87, one case only in each was reversed and all others affirmed. And, as I have said, they were all reversed for substantial reasons, in a great number of them for error solely attributable to the judge, in several for misconduct on the part of the district attorney. So it would seem that a prolific source of reversals is failure of the judge properly to apply the principles of law, and that district attorneys, stirred no doubt by misplaced partisan zeal, sometimes cause the very failures of justice of which they so bitterly complain. One remedy suggested by this review is for trial judges and district attorneys to endeavor to make criminal trials models of practice and free from such palpable errors as have required this court to enter judgments of reversal. Our present system of criminal jurisprudence is perhaps capable of improvement, but it cannot be denied that under it our jails and reformatories and penitentiaries are crowded to the very walls. It might be better to endeavor to enforce the laws we have by the procedure now in force than to attempt to change the procedure in such a manner as to relieve judges and

district attorneys of the consequences of their errors. Law is properly the growth of years; it is too much to expect or hope that we may overnight, by the fiat of rule, correct defects, fancied or real, in the jurisprudence established by years of research on the part of appellate courts, and in statutes tempered by generations of use.

As to the question of whether under the Constitution the making of rules of this kind is our *exclusive* province, I think we should reserve opinion until the question is before us. It is not now. But I do not wish to let it be thought that by failing to mention it I have overlooked or tacitly approved the opinion of the court in this respect. If one were to reduce to somewhat definite language the doctrine of the court on the subject, that doctrine could be phrased thus: "The power to make rules is ours; it is now, and always has been, since the adoption of the Constitution, one of our responsibilities and duties, and we shall exercise it without interference from any other department of government." That language, or words of similar import, could have been aptly made a part of the opinion of the court.

Doctrines of that kind have been entertained before. King Louis XIV may not but could have said, "L'etat c'est moi." King Louis XV may not but could have said, "After us the deluge." The fate of King Louis XVI was only too clearly foreshadowed. The judicial power of the state of Colorado is in our hands. *The law is what we say it is.* We need not be right; none can dispute us. The statutes of our legislature are impotent before our decree; the governor has no recourse when his acts are overturned by our decision. We are the state. But how long will we be the state if drunk with power, impatient of interference, and intolerant of the other branches of government, we continue the aggrandizement warranted and predicted by the court's opinion here? The Constitution which a majority of my brethren have said clothes us with these awesome rights sprang from the will, not of the courts, but of the people. We may be the state, our

immediate successors may see the coming flood, their successors may be swept away.

That Section 7099, C. L. 1921, has the force and effect ascribed to it by the court is, I think, wholly erroneous. Standing by itself it may be a legislative grant of the right we have sought to confer by rule, but it cannot be read alone. It was adopted in 1861 but so far as I can find no attempt to extend its provisions to include the power of judges to comment upon the evidence was ever heretofore made. The reason for this is that in 1868 the legislature adopted what is now section 7105, C. L. 1921, which provides that "The district court * * * shall only instruct the petit jury as to the law of the case * * *." The obvious inference from this is, and it has been always so considered by this court until the present time, that the court shall not instruct the jury upon matters of fact. *Minich v. People,* 8 Colo. 440; *King v. People,* 54 Colo. 122, 129 Pac. 235; *Ryan v. People,* 50 Colo. 99, 114 Pac. 306; *Ausmus v. People,* 47 Colo. 167, 107 Pac. 204. The only escape from the language of the latter statute is to hold that the word "instruct" does not and was not meant to include what in rule 14b we have denominated "comments." But, for reasons herein stated and the conclusions of Mr. Justice Butler, I am constrained to say that such a construction is too fanciful, too violative of the plain effect of our own previous decisions, to be considered seriously. Besides, if all our rules are not printed and bound in a separate book, but are scattered among our decisions, as was said in *Parker v. Plympton, supra,* we ought to hold that we are bound by them as much as the parties in the Parker case were, and that as a necessary consequence section 7099, C. L. 1921, gives us no such right as is claimed for it at all.

The theory of the rule under discussion is, I suppose, that trial judges are better fitted by training and education to detect the salient points of evidence and to separate the grain from the chaff. Otherwise stated, that the judges are better fitted to determine facts, as they

are better fitted to determine law. These arguments, at least, are the chief ones advanced by those who advocate the rule. But I wonder if this is so. Many very learned men have written of the inability of judges to weigh facts. Lord Campbell is quoted as saying: ''I remember a sergeant-at-law having a brilliant success at the bar from always believing that his client was entitled to succeed, although when a Chief Justice he proved without exception, and beyond all comparison, the most indifferent judge who has appeared in Westminster Hall in my time.'' And of other judges he said: ''The celebrated advocate when placed on the bench embraces the side of the plaintiff or of the defendant with all his former zeal, and—unconscious of impartiality or injustice—in his eagerness for victory becomes unfit fairly to appreciate conflicting evidence, arguments and authorities.'' Lord Chief Justice Tenterden, in *King v. Burdett,* 4 Barn. & Ald. 162, said that it is ''one of the peculiar advantages of our jurisprudence'' that in criminal cases ''the conclusion is to be drawn by men conversant with the affairs and business of life, and not by one or more lawyers whose habits might be suspected of leading them to the indulgence of too much subtlety and refinement.'' His opinion is quoted with approval in *Sparf v. United States,* 156 U. S. 51, 180. Judge Dillon, in Laws and Jurisprudence of England and America, p. 122, said: ''I recall with interest the views of the late Mr. Justice Miller and the change of opinion on his part on the subject of trial by jury. His opinions are of value, for by general consent he ranks among the ablest judges who have ever held a seat on the bench in this or in any country. He said to me at one time that his notion of an ideal trial court was a court composed of three judges to try all civil cases of law or fact. Some years afterwards, as the result of more observation and experience, he told me he had changed his views, and that he thought juries better judges of fact than judges.'' At page 168 of the same volume Judge Dillon said: ''Twelve good and

lawful men are better judges of disputed facts than twelve learned judges." In 21 American Law Review 863, Mr. Justice Miller himself said: "I am willing to give the benefit of my observation on this subject to the public that judges are not pre-eminently fitted over other men of good judgment in business affairs to decide mere questions of disputed fact." Our own reports are replete with reversals because the evidence below was entirely insufficient to sustain the judgment. The reports of other jurisdictions will furnish many similar examples. The search for truth is a marvelously difficult thing and no nearer successful solution than when Pilate asked his famous question. I, for one, believe that its pursuit may more safely be entrusted to "twelve good and lawful men * * * than twelve learned judges" or one learned judge.

After all, however, the chief objection to this rule of ours is that we have taken upon ourselves the solution of a political problem and wandered from our judicial duties. It is to the legislature, in my opinion, that such problems are committed by the Constitution and by the whole theory of our governmental system. Changes so radical as this should come from the representatives of the people, in assembly, where hearings and debate may be had in the light of day. We seven men who compose the Supreme Court have no right, I think, to meet in our star chamber and, without the knowledge or consent of the people, alter, abolish or repeal the acts of the legislature. I cannot believe that we had the right to make the rule here under discussion which repeals a statute adopted and in force for more than sixty years.

It is a political question. Sixty years ago the legislature said that our trial judges should not have this power, and during that sixty years no trial judge has successfully defied the statute where appeal was taken when he did. Why did the legislature of 1868 deprive the courts of this power, which otherwise they would have had? Was it because, as Judge Dillon says at page 129 of his

Laws and Jurisprudence of England and America, that "Soften or disguise the fact as best one may, such legislation * * * implies a distrust of the capacity of the judge to deal with the evidence in summing up so as not to be likely to do more harm than good." So, I say, we should not assume too much. We should not concern ourselves with political problems. We should bear in mind that the chief disputes, even in appellate courts, are not so often about what the law is, but about what are the facts. My own brief experience here indicates to my mind that that is so. The testimony of Mr. Justice Miller is reported in 21 American Law Review 863, where he said: "I must say that in my experience in the conference room of the Supreme Court of the United States, which consists of nine judges, I have been surprised to find how readily those judges come to an agreement upon questions of law, and how often they disagree in regard to questions of fact which apparently are as clear as the law."

In his contribution to the galaxy of opinions herein, Mr. Justice Burke has referred to my belief that permitting comments by the trial judge is an inferior practice. It is his belief that allowing such comments is a superior practice, and says that there is ample authority to support his position. My brother has overlooked the fact that I did not say there were not respectable, even learned, men on that side of the dispute. What I did say was that I knew of no authority that *experience* has demonstrated the superiority of that system. I presume some very honorable gentlemen have very honorably insisted that judges should have powers of that kind, and there is no doubt that the American Law Institute has drafted a proposed code of which section 337 permits comment by the judge on the testimony. But I perceive two very significant things with respect to that section which is quoted in full by Mr. Justice Burke. First, it demonstrates that it is possible to use words other than those used in rule 14b to express the thought involved.

Second, it demonstrates that the gentlemen who drafted the code did so on the theory that the code would be adopted by legislatures.

I cannot believe that Mr. Justice Burke weighed his language carefully when he asserted that the proposed code section "does not confine comments on the evidence to the identical time and method of instructions on the law." I submit that the section requires the judge to make his comments as a part of his charge and at the same time, and that if the instructions or charge be in writing the comments must be also. Like rule 14b, however, I apprehend that more definite language could have been employed, and that, although I am duly respectful to the fourteen men who drew it, especially now that their labor has received the seal of judicial approval, proposed section 337 is not as plain and adequate a statement of the matter as might be made. Apparently the fourteen authors had not considered the problem which makes rule 14b so inappropriate to our practice, viz., when shall the judge make his speech about the evidence, and in what form?

I am happy that Mr. Justice Burke has mentioned the journey I was lately privileged to make to Washington to attend the sessions of the American Law Institute, but his conclusions that my presence there marks my approval of all that body has done, did do, and will do, is hardly a correct one. As I find myself in this cause upon the side of the minority, so at one time at the sessions of the institute, as upon another occasion when I was at Washington, I was in the minority. I shall not venture a philosophic dissertation upon minorities; their potentialities, failures and successes have been often discussed. Many minorities are often right. Every member of this court subscribes to the tenets of a religion that claims but a minority of the people of the world, and at least two different faiths have more adherents than has our Christianity. Was not the Founder of our faith done to death because He was in a minority?

Mr. Justice Burke has taken exception to my statement that it is not the duty of the Supreme Court or of any court to be concerned with the guilt or innocence of a defendant, but I find from his argument that we are in agreement. I advanced the theory that it is the duty of the courts to take care that the defendant is given a fair trial according to law and that he be not deprived of life or liberty without due process of law. Mr. Justice Burke holds that "It is the duty of all courts vested with jurisdiction of criminal causes to so administer the law and so conduct themselves within it that the guilty may be convicted and the innocent acquitted." I perceive no difference in our conclusions. All I want is that trial judges and appellate judges shall not usurp the province of either the prosecutor or the defender, and I do not believé my brethren, or any of them, will disagree.

The opinions in this cause of my brethren and myself will fill many pages of our reports, but I do not feel they have been too voluminous. The liberty of John Kolkman was at stake—our duty required us to give our reasons for his continued imprisonment. The words of the opinion of the court will turn the scales of justice many times —our duty required that such important matters be set out at length. The language of the dissenting opinions will be of aid in determining the effect to be ascribed to the opinion of the court.

For the reasons above expressed, and for the reasons expressed in the opinion of Mr. Justice Butler, I am of opinion that the judgment should be reversed and new trial granted.

Mr. Justice Burke, specially concurring.

Believing that much of the persuasive force of portions of the dissenting opinions of Justices Butler and Hilliard rests upon what they overlook, rather than what they note, I feel obliged to add to the already too voluminous discussion of the questions here involved.

It should be borne in mind throughout, that the recent

legislative act referred to in the dissent has no application to the instant case and is not here under consideration. It was passed after our investigations were practically finished and our conclusions reached. It is involved only so far as we have been obliged, in answering the constitutional objection here raised and in examining the reasoning of Mr. Justice Hilliard in support thereof, to inquire into the source of the power to make the questioned rule.

We are told that "It is not the duty of the Supreme Court or of any court to be concerned with the guilt or innocence of a defendant." This is the doctrine which transforms a criminal trial into a game where rules outrank results, and relegates a judge to the position of an umpire. I can neither subscribe to it nor permit it to pass unquestioned. Juries, whose sole province in criminal trials is to decide the facts of guilt, are as much a part of the court as the judge. If their verdict be adverse to the defendant, and be supported by evidence, it must nevertheless be vacated and a new trial granted if it does not meet the approval of the conscience of the judge. *Piel v. People,* 52 Colo. 1, 119 Pac. 687. Is the trial court not "concerned with guilt or innocence?" Certainly Mr. Justice White, who spoke for this court in that case, and his associates thought so. The most common assignment of error in appellate courts, and the second assignment of error here, is that there is no sufficient evidence of guilt. The most common reason given for their refusal to reverse for minor errors is because guilt is overwhelmingly established and the errors are not prejudicial. Is this court not "concerned with guilt or innocence?" If not we have often gone far astray. It is the duty of all courts vested with jurisdiction of criminal causes to so administer the law and so conduct themselves within it that the guilty may be convicted and the innocent acquitted. For that purpose, and that purpose only, criminal statutes are enacted, criminal courts created, criminal procedure adopted, and all the compli-

cated machinery of the criminal law set up and operated.

All of the federal authorities cited by Mr. Justice Butler anent the power of the United States Supreme Court to make rules of practice and procedure, and all his conclusions drawn from bar association activities relating thereto, are stripped of their potency by a comparison of the state and federal constitutions.

"No person or collection of persons charged with the exercise of powers properly belonging to one of these departments [legislative, executive and judicial] shall exercise any power properly belonging to either of the others." Art. III, Colorado Constitution. There is no such provision in the federal Constitution.

"The Supreme Court * * * shall have a general superintending control over all inferior courts." Art. VI, sec. 2, Colorado Constitution. There is no such provision in the federal Constitution. True, said "control" is to be exercised "under such regulations and limitations as may be prescribed by law," Id. But since the two articles must be construed together the "law" referred to must not usurp judicial powers. To determine what powers properly belong to the judicial department one must go to the common law. Going there we find the power conferred by our rule was, from time immemorial, "judicial." To place it beyond question section 7099, C. L. 1921, providing that "all trials for criminal offenses shall be conducted according to the course of the common law" was passed in 1861. There is no such federal statute and "the federal courts have no common-law jurisdiction in criminal cases." 12 C. J., p. 197, §27.

Mr. Justice Hilliard questions the conclusion that the better practice, from the standpoint of the effective administration of justice, is that permitted by the rule, because no authority is cited or known to him. Since the proposition is incapable of mathematical demonstration, and since the legal power to decide it has never been vested, "authority," as he uses the term, must refer to the conclusions of those whose ability and experience

qualify them to express, and justify others in accepting, their opinions. In that sense such authorities are legion. A list of all the great jurists who have ever spoken or written on the subject in the past century would require little deletion before being filed as a list of such authorities. I present, however, this concrete case from the living present. In 1925 the American Law Institute, at the request of the American Bar Association, the American Institute of Criminal Law and Criminology and the Association of American Law Schools, undertook to aid in rescuing criminal procedure in this country from the reproach so forcefully summed up by the late Chief Justice Taft, by drafting a model criminal code. The actual work was done by some fourteen men whose qualifications therefor were probably unsurpassed by any similar group in the United States. They were advised and assisted by countless others throughout the country and the result of their labors subjected to the test of repeated examination and debate. After five years of such strenuous work they completed and presented to the council of the institute, which in May, 1930, adopted the proposed Code. Section 337 thereof reads: ''The court shall instruct the jury regarding the law applicable to the facts of the cause, and may make such comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause. It shall if requested inform the jury that they are the exclusive judges of all questions of fact and if the court comments on the evidence it shall so inform them whether requested or not. The charge of the court may be either written or oral.''

Here is a rule which, to say the least, is as broad as our own. That it represents, in the opinion of its authors and sponsors, progress, not retrogression, in the effective administration of the law is self-evident. If, as high authority for the questioned statement in the court's opinion, it is lacking in any particular, it is sufficiently reinforced by the fact that as this is being writ-

ten my brother Hilliard, as the representative of this court by the appointment of its chief justice, is in attendance at the annual meeting of the American Law Institute in the nation's capital. It is worthy of note that this proposed section vests in the trial court a discretion as broad as our rule, that it does not confine comment on the evidence to the identical time and method of instructions on the law, and that it lacks the advantage of having behind it at least a century and a half of judicial examination, decision and practice. Moreover, the practice authorized by our rule is substantially that of the vast majority of the courts of general jurisdiction of the English-speaking world. It is forbidden in but eleven of the states of the Union, and in Michigan only is the "comment" expressly limited to the charge.

Because the meaning of this rule has, in the past and now, been questioned, it is said to be veiled in "nebulous uncertainty" and if retained should be clarified, unless "we are incapable of stating any proposition of law in certain terms." Amplification promises only confusion. Like every other court, and every legislature and every textbook writer, we are incapable of stating any proposition of law in terms so certain as to preclude the meaning thereof ever being questioned. Human language is incapable of mathematical accuracy and law is not an exact science. The most questioned work in all the world is the Book of our Faith. Why should we expect success where inspiration failed?

I think the rule a salutary one, as definitely expressed as language allows, and fitted to our system without difficulty; that it concerns the exercise of a purely judicial power, and that the exclusive exercise of such powers by the courts is not only sanctioned, but commanded by the people themselves through the Constitution which is their supreme law.

Mr. Chief Justice Adams, specially concurring.

I concur in the main opinion, as written by Mr. Justice

Alter, which I think is unanswerable. The evidence of the defendant's crime is overwhelming. These facts should be kept in mind: John Kolkman, a member, if not the leader, of an organized gang of hog thieves, was convicted and sentenced to the penitentiary. The paper shafts of the honorable dissenting justices are so directed that they may tend to divert attention from the fact that Kolkman and his band of marauders stole Charley Burson's bacon on the hoof.

Legal questions involved have been so exhaustively treated that there is little to add in this respect, but I am struck with the significance of the fact that the efforts of the American Bar Association are directed toward the extension of the rule as to comments by judges on the evidence, instead of its restriction. If such rule is as bad as its enemies paint it, it seems strange, after a century and a half of experience with it, the American bar does not try to have it abrogated altogether, instead of securing its extension to the states.

I have no doubt that the weird admonitions and quizzical warnings gratuitously bestowed by Mr. Justice Hilliard on the majority members of the court as to their judicial duties and conduct are well meant, but his hint that if our opinions do not meet with popular acclaim, we may be swept away by a coming flood, contains a political philosophy so pernicious and shocking that it cannot be overlooked. If courts are to be intimidated, or if they must weigh their judgments in fear of reprisals at the polls, they stain the judicial ermine and are basely unworthy of public confidence. My undisturbed faith in the integrity of my worthy brother is such that I cannot believe he means that which his words imply.

No one can fail to be entertained by Mr. Justice Hilliard's dissertation on the subject of French kings, but what about Charley's hogs?

Judgment affirmed.